UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA

    -against-

ROY BURVICK

                                    NOTICE OF MOTION TO
                                         SUPPRESS

                                        23-cr-450

-------------------------------------------------------X

PLEASE TAKE NOTICE, that the defendant **Roy Burvick**, by his attorney **Allegra Glashausser**, of the Federal Defenders of New York, and upon the accompanying memorandum of law, will move the Court, before the Honorable Nina R. Morrison, United States District Judge for the Eastern District of New York, for an Order:

1.    Suppressing all physical evidence recovered from Mr. Burvick on or about July 1, 2023, including a gun, pursuant to Fed. R. Crim. P. 12(b)(3)(C) and the Fourth Amendment of the United States Constitution, and

2.    Suppressing all statements made by Mr. Burvick made to police on July 1, 2023, pursuant to Fed. R. Crim. P. 12(b)(3)(C), and,

3.    In the alternative, directing that a hearing be held outside the presence of the jury before trial as to the admissibility of this evidence;

4.    Granting such other and further relief as the Court may deem just and proper.

DATED:    BROOKLYN, N.Y.
              June 11, 2024

                                    _____/s/
                                    Allegra Glashausser
                                    Attorney for Mr. Roy Burvick
                                    Federal Defenders of New York
                                    1 Pierrepont Plaza, 16th Floor
                                    Brooklyn, N.Y. 11201

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA

     -against-

ROY BURVICK

                                   23-cr-450

--------------------------------------------------------X


**Memorandum of Law in Support of**
**Roy Burvick's Motion to Suppress**

Allegra Glashausser
Attorney for Mr. Roy Burvick
Federal Defenders of New York
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8739

## Introduction

On July 1, 2023, three NYPD officers responded to an anonymous call requesting that police ask a person sitting outside the caller's building to move somewhere else. The anonymous caller said this person said he had a gun; the caller also said that she didn't see a gun and didn't know if the person had been joking about it.

When police arrived, Roy Burvick was walking slowly home, carrying a small black plastic bag, the type you would get after purchasing something at a local convenience store. Mr. Burvick lived on a street around the corner from the address provided by the caller. He had walked through the gate in front of his home, when police called him back onto the sidewalk, and started asking him questions. Mr. Burvick was calm and respectful, and politely responded to the three officers. They asked him where he was coming from; he said a nearby store. They asked to search him; he said okay. The officers then told him he was allowed to decline the search, so he changed his mind, and declined. Officers asked what was in his pocket; he said his phone. They asked him for his security guard license; he gave it to them. They asked for his driver's license; he gave it to him. He was completely compliant and calm.

Despite this, after about four minutes of questioning, an officer asked him to lift up his arm, grabbed his pocket, and handcuffed him. After that, an officer reached into his pocket and found a gun. He was charged with possessing that gun, under 18 U.S.C. § 922(g)(1). Dkt. 1.

1

He is now moving to suppress that gun because the police did not have reasonable suspicion to stop or frisk him. He is also moving to suppress statements he made during his transportation by police because he was never read his *Miranda* rights. In the alternative, he respectfully requests that the Court hold a suppression hearing.

## Facts

<u>An anonymous call from 78 Saratoga Street</u>

At 6:17 p.m. an anonymous 911 caller said that a person who was "always" in "front of this building," "sitting in front of the door," had said that he had a gun, and had threatened to shoot somebody. Ex. A (RKB 14).[1] She did not see a gun. During her call, she said that he was sitting in front "with someone else." *Id.* She asked police to come and "ask him to move," adding that she was "just trying to get this guy not to be here." *Id.* She said that she didn't know if it was an "emergency emergency," but that "people are acting like it's nothing." *Id.* She added, "I don't know if he's joking or not…. I don't even know him…I don't know why he comes here every day." *Id.* She described the person as having dark skin, glasses, an army fatigue shirt, a purple bandana on his wrist, and a kufi. *Id.* When asked for her name, she said "anonymous." *Id.*[2]

---

[1] Exhibit A is an audio recording of the 911 call and exhibits B & C are body camera videos from Mr. Burvick's arrest. All three exhibits are available at this link: <u>https://tinyurl.com/mvuxwdu8</u>. The "RKB" numbers refer to the bate stamp labels on the government's discovery.

[2] This caller mentioned that she had called earlier; that call has not been produced in discovery.

Police arrived at 78 Saratoga street at 6:29 p.m., about 10 minutes later. Ex. B (RKB 11). When officers arrived, they asked a pedestrian if he had seen a "man threatening to shoot somebody." Ex. B (RKB 11) at 18:30. The pedestrian responded, "No. Not here." Ex. B (RKB 11) at 18:30 ("Sir did you see anyone out here threatening someone with a firearm?...Threatening to shoot somebody?"; "No. No. Not here. Not by here."). A radio message audible in the video said that when the person "saw them coming," he had "walked to the corner of MacDonough." Ex. B at 18:31. It was not clear who had conveyed that message. Officers asked the pedestrian another inaudible question[3] and the pedestrian pointed down MacDonough Street.

<u>Mr. Burvick was walking normally on the street directly in front of his house when police first saw him.</u>

Mr. Burvick lives at 689 MacDonough St. in Brooklyn. Body camera footage showed him calmly walking on MacDonough St., his block, towards his house. Ex. B (RKB 11) at 18:31. His movements were unhurried. *Id.* As the officers walked down MacDonough towards Mr. Burvick, an officer mentioned that the tip was from an "anonymous caller," ex. B (RKB 11) at 18:30, another officer says, "without giving a name we can't stop him." *Id.* at 18:31.

---

[3] This question appears to have been posed by the third officer. That officer's body camera footage has not been provided as of this writing.

3

Mr. Burvick had walked through the gate leading to his front steps, closing it behind him, when an officer called out, "sir can you come here for a second?" Ex. B (RKB 11) at 18: 32.



Mr. Burvick inside his gate when officers called out to him to "come here." Ex A (RKB 11) at 18:32:04.

In response to the officer, Mr. Burvick walked back out of his gate and back onto the sidewalk. *Id.* He walked slowly towards the officers. *Id.* He had a portable music player across his chest and was carrying a black plastic bag. *Id.*

Police asked him if he had had "any problems with anyone earlier, a couple minutes ago?" Ex. B & C (RKB 10) at 18:32.[4] He said, "no." He said he had been "listening to his music," "got something to eat" and was "returning home." *Id.* The officer said that someone had "called 911 on him and gave a pretty good description." *Id.* The officer said they were "inquiring" about "what had happened." *Id.* Mr. Burvick said, "oh, okay." He said he had his "ID, his security license; everything's legit." *Id.*

---

[4] The body camera footage labeled Ex. C (RKB 10) is from Officer Wendsy Charles; Ex. B (RKB 11) is from Lieutenant Gary Vanzanten, who is wearing a white shirt, and who ask most of the questions of Mr. Burvick. The time stamps – which should correspond to the time of day – on both videos are the same, but exhibit C (RKB 10) generally provides a better view of Mr. Burvick's body.

<u>Mr. Burvick politely and calmly answered numerous questions from the police.</u>

When police asked to search him, Mr. Burvick initially said, "no problem." Ex. B & C at 18:32. Then, however, the officer told him that he "didn't have to…and could refuse," so he replied, "oh, I refuse." *Id.* He said, "there's no problems. I'm just minding my own business." *Id.* at 18:33.

The officer asked if he was a "firearm holder" because he had mentioned having a security guard license. *Id.* Mr. Burvick first said yes, but then said, that he was working on getting that license. *Id.* Police asked if he had a license to carry a gun and Mr. Burvick said, "no." *Id.* They asked for his security guard license and he said he could "get it for" them, putting towards his house. *Id.* They asked again if he had it on him. *Id.* Mr. Burvick took out his wallet from his right pocket and handed them his security license. *Id.*

They asked his date of birth; he answered. *Id.* 18:34. They asked for his driver's license; he took out his wallet again from his right pocket and gave it to them. *Id.* The officer asked, "what's in your pocket, down here, weighing heavy?" *Id.* Mr. Burvick replied, "my phone and stuff." *Id.*  The officer said his phone was "back there," pointing to Mr. Burvick's back pocket, and Mr. Burvick said he that he had "another phone." The officer asked to "see it." Mr. Burvick said "I refuse." *Id.*

(The police's later search showed that Mr. Burvick was telling the truth. He had two phones, one in his back pocket and one in his right pants pocket, exactly as he had said. Ex. C (RKB 10) at 18:38. His pockets were also full of innocuous items,

including charging cords. *Id.* at 18:38-40. Inside his plastic bag were bags of chips and

soda. RKB 12 & 13 18:49 (video from precinct as police inventory his property)).



Screen shot from Ex. C (RKB 10) at 18:33, showing Mr. Burvick moving the plastic bag to his left hand to get his wallet out, as requested by the officer.

While one of the officers held his driver's license, Mr. Burvick asked the

officers what the complaint was about. *Id.* 18:35. The officer replied, "you were

pulling a gun out on people." *Id.* He replied, "no, false complaint." He added, "I've

been in this neighborhood all my life….why would I do something irregular like that

in the neighborhood where I live…I don't bother nobody." *Id.* If someone says "I'm

playing the music too loud, I turn it down." *Id.* 18:36. He said was coming from a

store on Ralph. *Id.* The white-shirted officer said, "do me a favor and move that bag"

so "I can see that pocket." Ex. C (RKB 10) at 18:36. Mr. Burvick did so:



Mr. Burvick moving his arm away from his body at the officer's request. Ex. C at 18:36:10.

The officer took Mr. Burvick's plastic bag from him, squeezed Mr. Burvick's pocket, and handcuffed him. *Id.* 18:36:15.  Another officer took a gun out of the pocket.

Afterward, the lieutenant said to the other two officers: "I'll explain to you why I did that. Weighting, covering with the bag...good job...it's your first gun, be happy kid." Ex. B (RKB 11) at 18:37.

<u>Mr. Burvick is questioned while in the police car.</u>

After Mr. Burvick was handcuffed, the officer asks, "Were you shooting dice today?" and he said, "Yes…" Ex. B (RKB 11) at 18:40 (it is difficult to hear Mr.

Burvick's full response). In the car, the lieutenant asked him, "do you have a license for it, legit and in your name?" Ex. B (RKB 11) at 18:42. Mr. Burvick gives an inaudible response and the officer replied, "then it's illegal." *Id.* The lieutenant continued the conversation, saying "I know it may be a stupid question to you, but I just want to know why you're carrying it on you now….you gotta do things the right way." Ex. B (RKB 11) at 18:44. Mr. Burvick responded, "I'm trying to stay out of trouble. I told you, I have it for protection…I never hurt nobody with it…I work, go home…I was minding my own business." *Id.* As they were walking into the precinct, the officer said that Mr. Burvick is "jacked" and doesn't need a gun. *Id.* 18:45. Mr. Burvick's response is mostly inaudible, but he said again, "I was minding my business." *Id.*

At the police station, the back and forth between the officers and Mr. Burvick continued. It is difficult to hear, but Mr. Burvick said, "I work at the gym right there…I'm not bothering nobody…people are vandalizing my property." RKB 12 at 18:45 (at police station).

A post-arrest, precinct photo of Mr. Burvick, showed that his cargo pants were a bit bulky, even when empty, as cargo pants are typically. *See* Ex. B (RKB 11) at 18:38 (showing police take everything out of his pockets before he gets into the police car).



**Argument**

**Point I**

**Police lacked suspicion to stop or frisk Mr. Burvick, who they saw calmly walking down the street and through the front gate to his house, answered their questions fully and respectfully, and did not appear suspicious.**

An anonymous caller asked police to come to her building at 78 Saratoga

Avenue to ask a person, who she said was sitting right outside the building, to move.

She claimed this person had <u>said</u> he had a gun; she had not seen a gun. When police

arrived more than 10 minutes later, no one was sitting outside that address. They

9

asked a pedestrian if they had seen someone with a gun; he said no. Police then saw

Mr. Burvick, who was walking on a nearby block at a leisurely pace, wearing clothing

similar to the clothing described by the anonymous caller. Police approached him as

he walked through the gate to his home, and asked him to "come here," back to the

sidewalk. Mr. Burvick did. After that, he continued to calmly comply with every police

command and answer all their questions. He did nothing to arise suspicion.

Nonetheless, police frisked him. Based on the totality of these circumstances, police

lacked sufficient suspicion to stop or frisk Mr. Burvick.

A. <u>Police need reasonable suspicion to stop a person and need reasonable
   suspicion a person is armed to frisk a person.</u>

It is well settled that in order to conduct a stop of a person, a police officer

must possess reasonable suspicion that the person is engaged in criminal activity. *Terry
v. Ohio*, 392 U.S. 1, 23 (1968); *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir. 1991)

(A "government law enforcement agent may subject an individual to an investigative

stop upon a reasonable suspicion that the individual is, has been, or is about to be

engaged in criminal activity). An unparticularized suspicion or hunch is not

enough. *See Terry,* 392 U.S. at 22. Rather, the police must point to "specific and

articulable facts which, taken together with rational inferences from the facts,

reasonably warrant [the] intrusion." *Id.* at 21.

A "seizure" under the Fourth Amendment occurs once an officer, "by means

of physical force or show of authority, . . . in some way restrained the liberty of a

10

citizen." *Terry*, 392 U.S. at 19 n.16. It is a seizure when an officer issues and order and the person complies. *United States v. Simmons*, 560 F.3d 98, 105-06 (2d Cir. 2009). *See also Brendlin v. California*, 551 U.S. 249, 254 (2007) (A "police officer may make a seizure by a show of authority and without the use of physical force" but with "actual submission"); *United States v. Allen*, 813 F.3d 76, 86 (2d Cir. 2016) ("From the point at which the officers told Allen that he would need to come down to the police station to be processed for the assault, they had asserted control over his person.").

Even if the police have reasonable suspicion for a stop, an officer may only frisk a lawfully stopped individual, if the officer has reasonable suspicion to believe that the person "is armed and presently dangerous to the officer or to others." *Arizona v. Johnson*, 555 U.S. 323, 325 (2009) (quoting *Terry*, 392 U.S. at 24) (internal quotation marks omitted); *see also Sibron v. New York*, 392 U.S. 40 (1968) (holding that frisk violated Fourth Amendment because no reasonable suspicion that the person stopped was armed); *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir. 1991) (A "government law enforcement agent may subject an individual to an investigative stop upon a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity).

B. Police lacked reasonable suspicion to stop Mr. Burvick

Mr. Burvick was stopped at the beginning of his interaction with police. He was on his property, having walked through and closed a gate leading to his house, when

three police, hurrying down the block, told him to "come here" to the sidewalk. Ex. B (RKB 11) at 18: 32. As explained above, a person is stopped and seized when an officer issues an order and the person complies. *Simmons*, 560 F.3d at 105-06 (2d Cir. 2009; *Brendlin*, 551 U.S. at 254; *Allen*, 813 F.3d at 86. A reasonable person would have believed that they had to comply with the police command to "come here." As soon as Mr. Burvick complied with this command, going back out of the gate leading to his house and back onto the sidewalk, he was stopped by police.

The police had little information when they stopped Mr. Burvick: they had a report from an anonymous caller, who had made an unsubstantiated complaint that a person outside her building had "said" he had a gun; and they had seen Mr. Burvick, who appeared to match the anonymous caller's description, walking in a leisurely manner to his house. This did not amount to reasonable suspicion. *See e.g., Florida v. J.L.*, 529 U.S. 266, 268 (2000) ("The question presented in this case is whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. We hold that it is not"). The police should not have told Mr. Burvick to come back to the sidewalk to talk to them.

First, there was no reason to believe the anonymous caller was reliable. She would not give her name or number and had not provided accurate information to police in the past. The only details that she mentioned that could be corroborated were Mr. Burvick's clothing. That she provided an "accurate description" of his "readily observable …appearance," however, does not make her report about <u>a gun</u>

12

reliable. *See J.L.*, 529 U.S. at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person"). (Indeed, the anonymous caller here was actually less accurate that the tipster in *J.L.*, as Mr. Burvick was not at the location she described). That is especially true as nothing about Mr. Burvick's affect or actions suggested that he had been doing anything except what he said he had been doing – going to the store and coming home. The anonymous caller's remarks with respect to somebody having a gun were completely uncorroborated. *See United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) (a court must consider "an informant's veracity, reliability and basis of knowledge, and the extent to which an informant's statements . . . are independently corroborated"). On the contrary, the only person the police talked to in the area said that he had not heard anything about anyone having a gun.

Second, even taking the anonymous caller's remarks at face value, she had not seen a gun. She said that someone had "sa[id] he had a gun" or "talk[ed] about how he has a gun." The caller herself was unsure whether the person actually had a gun, saying, "I don't know if he's joking or not." She said, almost as an aside, that the person had, at some point, threatened someone, but she was much more focused on the fact that the person did not live at her building, but was "always" hanging out there. The caller was not calling to report a crime: she was calling to report a nuisance. She was asking police to have this person move away from her building; she repeatedly said "they should just ask him to move," "please ask the officers to ask him

to leave," and "we're just trying to get this guy not to be here." She explained that she wasn't sure if 911 was the right place to call because it wasn't an "emergency emergency." This call, therefore, did not provide reasonable suspicion that a crime was being committed.

Third, subsequent to the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022),[5] that a person may have a gun is also not a reason to believe that they are committing a crime. *See United States v. Homer*, No. 23-CR-86 (NGG), 2024 WL 1533919, at *18 (E.D.N.Y. Apr. 9, 2024) (suppressing gun based on "the intersection of a newly expanded Second Amendment with the legal protections of the Fourth Amendment"). Possessing a gun is constitutionally protected conduct; it is not presumptively unlawful. While police eventually asked Mr. Burvick if he had a license to carry a gun, this was well after he had already been unlawfully seized. Any events that occurred after Mr. Burvick was seized "cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013).

Nothing the officers saw Mr. Burvick do or what he looked like could have reasonably added to their any suspicion that a crime was afoot. All the police had was the anonymous caller's vague remarks, coupled with Mr. Burvick's compliant,

---

[5] *Bruen* is discussed at length in Mr. Burvick's motion to dismiss, also filed today.

respectful deportment. Based on these facts, the police lacked reasonable suspicion to stop him.

C. Police lacked reasonable suspicion to frisk Mr. Burvick.

Even if police were justified in stopping Mr. Burvick, they did not have the authority to frisk him. Mr. Burvick's conduct after he was stopped should have dispelled any of the vague suspicion police had based on the anonymous tip. Police spoke to Mr. Burvick for about four minutes before they grabbed his pocket. During that time, Mr. Burvick was indisputably calm, polite, and respectful. He answered all of their questions and his answers were credible and ordinary. He gave them his security license and his driver's license. Nothing about anything he said or how he looked should have reasonably heightened the officers' suspicions. Indeed, he initially told the officers that they could search him, only changing his mind when they told him he didn't have to agree. This fact alone should have significantly dispelled any suspicion.

After the arrest, the lieutenant explained to the other officers why he had frisked Mr. Burvick, saying: "I'll explain to you why I did that. Weighting, covering with the bag." Ex. B (RKB 11) at 18:37. Neither of these explanations were enough to justify the frisk. First, Mr. Burvick was not doing anything suspicious with his plastic bag, which turned out to be full of chips and soda. Just as he had explained, he had gone to the store. He was simply holding the bag at his side while he talked to the

15

officers. He also had moved the bag twice on his own, to get his wallet out twice for the officers. He did that normally and without any seemingly concern or hesitation. Nothing about how he held the bag appeared unusual.



Screen shot from Ex. C (RKB 10) at 18:33, showing Mr. Burvick moving the plastic bag to his left hand to get his wallet out, as requested by the officer.

Second, his pockets also appeared normal. His right pocket looked like there was something in it, but it did not look like there was a gun in it.



Mr. Burvick moving his arm away from his body at the officer's request. Ex. C at 18:36:10.

Having something in a pocket, including something that is heavy, isn't suspicious. *See, e.g., United States v. Dixon*, 2021 WL 1662492, at *15 (S.D.N.Y. Apr. 28, 2021) (suppressing evidence; observation of a "heavy object," repeated adjustment, and looking "nervous" insufficient); *United States v. Price*, No. 13-CR-216 RRM, 2014 WL 558674, at *13 (E.D.N.Y. Feb. 11, 2014) (suppressing evidence despite testimony about touching a "heavy object" in pants pocket). *See also Floyd v. City of New York*, 959 F. Supp. 2d 540, 635 (S.D.N.Y. 2013) ("to conclude that the bulge created by the now ubiquitous cell phone can provide the additional corroboration necessary to justify an invasive stop and frisk would eliminate the corroboration requirement entirely"); *Singleton v. United States*, 998 A.2d 295 (D.C. 2010) ("generic bulge in a pocket can be explained by too many innocent causes to constitute "reasonable" suspicion"). When asked, Mr. Burvick said he had a phone inside his pocket. This turned out to be true.

Nothing about Mr. Burvick's appearance or movements reasonably suggested that he had a gun in his pocket.

### D. Police lacked the authority to order Mr. Burvick off of the curtilage of his property.

The Court should also find that the police order for Mr. Burvick to exit the curtilage of his property and come back onto the sidewalk was unconstitutional not just because they had no reasonable suspicion to stop him but also because more than reasonable suspicion is required to order someone to leave their own property. While police could have talked to Mr. Burvick on his curtilage if he were talking to them voluntarily, this was not a voluntary conversation. Police did not tell Mr. Burvick that he was free to leave or that he did not have to talk to them. Instead, their words conveyed the opposite: he was told by police to "come here." A reasonable person would have believed that they had to comply. Had Mr. Burvick simply ignored the police and continued walking into his home, police could not have followed him. There was no exigency; they had no warrant, and Mr. Burvick was on his curtilage. Mr. Burvick did what a reasonable person would do, however, and complied with the officer's order. It would be an absurd result to say that Mr. Burvick's constitutional protections diminished because of his compliance.

An individual's home is afforded the highest level of Fourth Amendment protection. *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (the "very core" of the Fourth Amendment stands "the right of a man to retreat into his own home and there

be free from unreasonable governmental intrusion"). Police cannot arrest someone at home without a warrant. *Payton v. New York*, 445 U.S. 573 (1980). In *Jardines*, the Supreme Court made clear that the protection of the home extends to the areas immediately surrounding the home, known as the curtilage. *Jardines*, 133 S. Ct. at 1414 (noting that the protection of the home would be of "little practical value" if government agents could "stand in a home's porch or side garden and trawl for evidence with impunity"). *See also Collins v. Virginia*, 584 U.S. 586 (2018) (applying this rule to the search of a motorcycle in the curtilage of a home). The holding of *Jardines* and *Collins* are about warrantless searches: police cannot search the curtilage without a warrant. *Id.*

The Supreme Court has not yet weighed in on the intersection of *Terry*, *Jardines*, and *Payton* and circuits are split about whether a person can be stopped based on reasonable suspicion in the curtilage. *See* J. Ross Hamrick, "First Among Equals: How the Curtilage Doctrine Bars A *Terry* Stop and Frisk Inside the Curtilage After *Jardines* and *Collins*, 52 U. Mem. L. Rev. 577 (2022) (describing the circuit split on this issue and arguing that *Terry* stops are barred within the curtilage). The Second Circuit has interpreted *Payton* broadly, applying it regardless of whether officers themselves cross the threshold into the home. *Allen*, 813 F.3d at 88–89 ("that where law enforcement officers summon a suspect to the door of his home and place him under arrest while he remains within his home, in the absence of exigent circumstances, *Payton* is violated

regardless of whether the officers physically cross the threshold.").[6] And, in
reaffirming that warrantless searches of the curtilage are prohibited in *Alexander,* the
Second Circuit rejected the argument of the concurrence which suggested "a
provocative and novel approach to determining the constitutionality of police
searches" of curtilage using a reasonable suspicion analysis. *United States v. Alexander*,
888 F.3d 628, 637 (2d Cir. 2018). As the majority noted, Supreme Court precedent
does not allow incursions into the curtilage based on reasonable suspicion. *Id.*

Here, there is little question that Mr. Burvick was on his curtilage: he had a gate
surrounding his home and was standing within an enclosed area akin to a front porch
or front yard. *See United States v. Dunn*, 480 U.S. 294, 301 (1987). *See also Alexander*, 888
F.3d at 634. This Court should find that the police should not have been able to order
him off of his property to stop and seize him without at least probable cause, if not a
warrant.

*     *     *

The defense must "make a preliminary showing as to the circumstances of the
arrest sufficient to raise a question as to its legality." *United States v. Pena*, 961 F.2d 333,
338-39 (2d Cir. 1992) (citing *United States v. Rivera*, 321 F.2d 704, 706 n. 1. (2d Cir.

---

[6] While the *Allen* court claimed that its decision did not conflict with *United States v. Gori*, 230 F.3d 44
(2d Cir. 2000), a case in which then-Judge Sotomayor issued a lengthy dissent, and which appeared
to overlook both *Payton* and curtilage law, the reasoning of *Allen* is in strong tension with *Gori*. In
any event, *Gori* was decided decades before *Jardines* and *Collins* reaffirmed that curtilage is afforded
the same constitutional protection as the home.

1963)). Once the defense has shown a basis for the motion, the "burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth Amendment." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) ("if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search"). *Accord United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008) (the "Government bears the burden of proof as to establishing probable cause"). *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (hearing necessary when the determination of probable cause depends exclusively on "contested issues of fact going to the validity of the search . . . in question"). This Court should, therefore, grant Mr. Burvick's motion to suppress or hold an evidentiary hearing on these issues.

The Court should also suppress any evidence obtained as a consequence of the illegal stop and frisk, pursuant to the "fruit of the poisonous tree" doctrine. *See United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (citation omitted); *Wong Sun v. United States*, 371 U.S. 471 (1963). This includes statements made by Mr. Burvick during the interaction with the officers.[7]

---

[7] Discovery provided by the government also indicates that DNA testing was requested, but no DNA testing results have currently been provided to defense counsel. Any DNA results should also be suppressed as a fruit of the poisonous tree. Additionally, if such results are provided, the defense reserves the right move to suppress those results on other grounds, or otherwise challenge the testing and admissibility of any DNA results.

## Point II

### Mr. Burvick's post-arrest statements, made without any *Miranda* warnings, must be suppressed.

The now-familiar *Miranda* case created a bright-line per se rule: no custodial interrogation may proceed until *Miranda* warnings are effectively and adequately conveyed and the defendant knowingly, intelligently, and voluntarily waives his rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). Interrogation includes "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). This includes "words or actions on the part of the police" "that the police should know are reasonably likely to elicit an incriminating response." *Id.* The prosecution bears a "heavy burden" to show compliance with the *Miranda* procedure by "at least the preponderance of the evidence." *Missouri v. Seibert*, 542 U.S. 600, at 608 n.1 (2004); *Miranda*, 384 U.S. at 475.

Mr. Burvick was not read his *Miranda* rights, yet was asked questions by officers after his arrest, while walking to the police car, in the police car, and at the precinct. His statements were made in response to police questioning, or the functional equivalent. None of his statements should be used against him.

## Conclusion

The Court should, accordingly, grant Mr. Burvick's motion to suppress or hold an evidentiary hearing.

Respectfully submitted,

s/_____

Allegra Glashausser
Attorney for Mr. Roy Burvick
Federal Defenders of New York
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201