UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
UNITED STATES OF AMERICA

                                        MEMORANDUM AND
                                        ORDER

                                        23-CR-450 (NRM)

                -against-

ROY BURVICK,

                Defendant.

---------------------------------------------------------------x

NINA R. MORRISON, United States District Judge:

      In this action, Defendant Roy Burvick is charged with a single count of unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  *See* Indictment, ECF No. 1.  Now pending before the Court is Burvick's motion to suppress (1) evidence obtained after police stopped and questioned him on a street in Brooklyn, New York, including a firearm that police recovered from his pants pocket after he declined to consent to a search of his person, and (2) statements Burvick made to the police following his arrest.

      The Court has considered the parties' written briefs, the testimony given, and exhibits entered at the suppression hearing held on August 26, 2024, the parties' statements at oral argument held on October 10, 2024, and the supplemental briefs filed by the parties thereafter.  For the reasons outlined below, Burvick's motion to suppress the physical evidence obtained from the search of Burvick's person is GRANTED.  In the interest of judicial economy, the Court reserves decision on

Burvick's motion to suppress statements that he made to police following his arrest — which he asserts were elicited at a time when he had not yet been advised of his *Miranda* rights — until the parties have an opportunity to confer regarding the status of the case in light of this opinion.

## OVERVIEW

On July 1, 2023, three New York City police officers received a radio dispatch alerting them to a 911 call alleging that an unnamed man had "threatened" people in the area and said he had a gun. The dispatcher communicated to the officers that no gun was shown and described the caller as anonymous.

When the officers arrived at the location of the alleged incident, there was no person making threats, nor anyone complaining of having been threatened. When they turned the corner, the officers observed Roy Burvick, whose physical appearance and clothing fit the 911 caller's description, walking down the street. After Burvick entered the gate that separated his home from the sidewalk, one of the officers told him to "come here," and Burvick immediately complied, returning to the sidewalk and calmly speaking with police for several minutes. That officer questioned Burvick, asked for identification, and ultimately frisked him. Upon searching Burvick's person, the officer found a concealed firearm and arrested Burvick. After his arrest, the officers failed to advise Burvick of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Burvick then made a series of statements to officers while under arrest in the police car and while at the police precinct. Burvick was later charged in

a one count federal indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Indictment at 1.[1]

Burvick seeks to suppress all physical evidence the New York City Police Department ("NYPD") obtained on July 1, 2023, including the firearm, on the ground that the officers lacked reasonable suspicion for both the seizure and the subsequent pat-down frisk.  Mot. to Suppress (the "Motion") at 1, ECF No. 20.  This Court finds, first, that Burvick was "seized" for Fourth Amendment purposes, at the very latest, at the time the officers asked him for his security guard license, and that under the totality of the circumstances the officers lacked the necessary reasonable suspicion to justify the seizure.  Second, the Court finds, independent of any cause the officers may have had to investigate the caller's allegations through a brief investigatory seizure under *Terry v. Ohio,* 392 U.S. 1, 30 (1968), they nonetheless did not have the required reasonable suspicion that Burvick was armed and dangerous at the time when the supervising lieutenant on the scene decided to conduct a pat-down frisk of Burvick's lower body and pants pocket.  For these reasons, the Court grants Burvick's motion to suppress the physical evidence, including the firearm, that the officers recovered from his person.

## FACTS AND PROCEDURAL HISTORY

The Court makes the following findings of fact based on the briefs and exhibits submitted by the parties, testimony at the suppression hearing, and oral argument following the hearing.

---

[1] All page references use ECF pagination except where noted.

## I.      Background facts

Roy Burvick was initially arrested by state authorities on the allegation that he unlawfully possessed a firearm on July 1, 2023.  *See* Def.'s Nov. 16, 2023 Letter, ECF No. 3 at 2.  Approximately four months after his arrest, Burvick was indicted on the instant charge for unlawful possession of the same firearm and arrested by federal authorities.  *Id.*  On June 11, 2024, Burvick filed a motion to suppress the firearm and other physical evidence obtained by law enforcement during Burvick's police encounter on July 1, 2023 and statements Burvick made to the police or, in the alternative, an evidentiary hearing to determine whether suppression was warranted.  *See* Mot. at 1.  The government opposed the Motion.  *See* Opp'n (the "Opposition"), ECF No. 23.  After reviewing the Motion, the Opposition, and a reply brief in support of the Motion (the "Reply", ECF No. 25), the Court held an in-person evidentiary hearing on August 26, 2024.  *See* Minute Entry for Aug. 26, 2024.

At the hearing, the government presented testimony from one witness, NYPD Lieutenant Gary Vanzanten.  It also offered into evidence Vanzanten's activity log, as well as footage from Vanzanten's body-worn camera and another responding officer's body-worn camera.  The defense presented certain NYPD reports created in connection with the NYPD's stop and search of Burvick and body-worn camera footage from a third responding police officer.

## II.     The suppression hearing

The following facts are based on the hearing held by this Court on August 26, 2024, including the Court's review of the footage from the body-worn cameras of the responding officers, which were submitted as exhibits to the hearing by the parties,

and its assessment of the credibility and demeanor of the lone testifying witness at the hearing as he described his recollection of the events depicted (in part) in the audio, video, and documentary exhibits.

At 6:17 p.m. on July 1, 2023, a person called 911 to report an alleged harassment in progress at 78 Saratoga Avenue in Brooklyn, New York. Mot. at 4; Opp'n at 3. A police dispatcher relayed the information provided by the 911 caller over the radio to police officers in the area. *See* Tr. 43:2–14.[2] The information provided by the dispatcher to the responding police officers is memorialized in a written report (the "911 Report"). *See Id.* 43:23–44:1. The dispatcher reported that a female caller stated that a male was sitting outside 78 Saratoga Avenue, allegedly "threatening" people, and "saying he has a gun." *See* Ex. A at 10, ECF No. 23-1 (the "911 Report"); Suppression Hr'g Def. Ex. C at 1, Unredacted 911 Report. The dispatcher described the suspect as a Black man with dark skin, wearing glasses, an army fatigue shirt, a purple bandana around his wrist, and a yarmulke on his head. *Id.* The dispatcher characterized the caller's accusation as that the suspect was "threatening tenants with a firearm," while also clarifying that that no firearm had actually been shown. *Id.* The caller also alleged that the suspect was "yelling at people." The dispatcher twice stated that no one was injured. The dispatcher did not provide the 911 caller's name, and characterized the caller as anonymous, but relayed the caller's phone number. *Id.*

---

[2] "Tr." refers to the transcript of the suppression hearing held on August 26, 2024.

Approximately ten minutes after the 911 call, around 6:30 p.m., three New York Police Department ("NYPD") officers — Lieutenant Vanzanten, Officer Charles, and Officer Daguanno — responded to 78 Saratoga Avenue. Tr. 19:1–5. All three officers were in uniform. *See generally* Suppression Hr'g Gov. Ex. 1, Lt. Vanzanten Bodycam Footage; Suppression Hr'g Def. Ex. A, Officer Daguanno Bodycam Footage. They each wore body cameras that recorded the officers' interactions with Burvick from various angles. *See generally* Suppression Hr'g Gov. Ex. 1; Suppression Hr'g Def. Ex. A; Suppression Hr'g Gov. Ex. 2, Officer Charles Bodycam Footage. As is apparent on the video, there was still ample daylight on this early evening in July when the officers arrived to investigate the 911 caller's allegations.

### A. Bodycam footage

When the officers arrived at 78 Saratoga Avenue, they did not see any person yelling or threatening anyone, with or without a firearm. One of the responding officers asked a passerby whether he had seen anyone threatening others, and the passerby said he had not. *See* Suppression Hr'g Gov. Ex. 1 at 1:26–1:32 (Timestamp 18:30:41–18:30:47); Suppression Hr'g Def. Ex. A at 1:37–1:50 (Timestamp 18:30:39–18:30:53).

As the officers began to look for the suspect described in the radio run, the dispatcher advised them that "as soon as [the suspect] saw you coming, he walked to the corner" of a nearby intersection. Suppression Hr'g Gov. Ex. 1 at 1:41–1:45 (Timestamp 18:30:55–18:31:00). The officers walked to the corner identified by the

dispatcher, and as they rounded the corner, they saw a man they believed to be the suspect. *See id.* at 1:58–2:03 (Timestamp 18:31:13–18:31:17).

As they walked down the street following the man, Vanzanten asked, "It's an anonymous caller?" Upon his fellow officer's affirmative response, Vanzanten replied, "Fuck." *Id.* at 2:05–2:09 (Timestamp 18:31:20–18:31:24).

As the officers walked down the street, Officer Daguanno can be seen and heard on his cell phone, saying, "We're watching him walk down the street now. What's your name, miss?" *Id.* at 2:15–2:18 (Timestamp 18:31:30–18:31:33); Supp. Hrg. Def. Ex. A at 2:27–2:30 (Timestamp 18:31:30–18:31:33). Officer Daguanno then said, "Okay, well, without giving your name we can't stop him, so." Suppression Hr'g Gov. Ex. 1 at 2:22–2:25 (Timestamp 18:31:37–18:31:39); Suppression Hr'g Def. Ex. A. at 2:34–2:37 (Timestamp 18:31:37–18:31:40). The bodycam footage captured Officer Daguanno asking, "Your name is D-E-E?" Suppression Hr'g Gov. Ex. 1 at 2:30–2:31 (Timestamp 18:31:44–18:31:46); Suppression Hr'g Def. Ex. A at 2:42–2:43 (Timestamp 18:31:45–18:31:46). Officer Daguanno then asked, "When he said he had a gun, did he, like, say where it was, or point?" Suppression Hr'g Def. Ex. A. at 2:52–2:56 (Timestamp 18:31:54–18:31:59).

As the officers walked down the street, Burvick entered a gate into the front yard area of his residence, which appears to be a rowhouse adjacent to other rowhouses. Suppression Hr'g Gov. Ex. 1 at 2:46–2:47 (Timestamp 18:32:02–18:32:03). The area was Burvick's "curtilage," *i.e.,* the area immediately surrounding his home. When Vanzanten observed Burvick enter the gated front yard of his home,

he told Burvick, "Sir, come here for a second." *Id.* Given the tone and volume of Vanzanten's voice and the speed of his and the accompanying officers' gait, Vanzanten's statement was intended to be — and would reasonably be interpreted by the recipient as being — an official directive or command.

The officers were many feet away from Burvick and continued walking toward him. *Id.* After Vanzanten called out to him, Burvick walked back through his front gate and traversed the sidewalk at a moderate, natural pace to meet the officers. As Burvick walked toward the officers, his home was behind him. *Id.* at 2:47–2:57 (Timestamp 18:32:03–18:32:11). As the officers walked toward Burvick, Vanzanten told Daguanno, "Just keep talking" — an apparent reference to the phone call he was on at that time. Suppression Hr'g Def. Ex. A at 3:05–3:06 (Timestamp 18:32:08–18:32:09). Daguanno ended the call seconds later. *Id.* at 3:08–3:11 (Timestamp 18:32:11–18:32:14). By the time Burvick met the officers, they were standing adjacent to the front gate of a different home, with Burvick's residence many feet behind Burvick. Suppression Hr'g Gov. Ex. 1 at 2:57 (Timestamp 18:32:12). However, they remained talking on a public sidewalk in full view of other neighbors and passersby.

Burvick fit the description of the suspect provided by the 911 caller. He is a Black man; he was wearing black cargo pants, a camouflage-style t-shirt, and a bandanna on his wrist; and he carried a black plastic bag in his right hand. The three officers were in their uniforms with their weapons visible. Suppression Hr'g Gov. Ex. 1 at 2:57 (Timestamp 18:32:12); Suppression Hr'g Gov. Ex. 2 at 3:10 (Timestamp

18:32:10); Suppression Hr'g Def. Ex. A at 3:10 (Timestamp 18:32:13). Vanzanten had his right hand on his firearm and kept it there as he questioned Burvick. Suppression Hr'g Gov. Ex. 2 at 3:10–4:42 (Timestamp 18:32:13–18:33:42).

Vanzanten asked Burvick if he was having "any problems with anybody earlier — a couple minutes ago?" Suppression Hr'g Gov. Ex. 1 at 2:57–3:00 (Timestamp 18:32:12–18:32:15). Burvick said he wasn't; he was "minding my own business," listening to his music, getting something to eat, and then returning home. *Id.* at 3:00–3:10 (Timestamp 18:32:15–18:32:25). Vanzanten told Burvick someone "was calling 911 on you," that he matched the description, and that they were inquiring as to what happened. *Id.* at 3:10–3:26 (Timestamp 18:32:25–18:32:41). Vanzanten then asked, "You don't have anything on you you're not supposed to have on you, any weapons or anything like that?" *Id.* at 3:27–3:29 (Timestamp 18:32:42–18:32:44). Burvick said he had his "ID" and his security license, and that everything was "legit." *Id.* at 3:29–3:33 (Timestamp 18:32:44–18:32:48).

Vanzanten then asked Burvick if he would mind if Vanzanten searched him. Burvick said "no problem," offering his consent. *Id.* at 3:34–3:37 (Timestamp 18:32:49–18:32:52). Immediately after Burvick consented, however, Lieutenant Vanzanten said, "You don't have to — I'm just letting you know you can refuse." *Id.* at 3:37–3:40 (Timestamp 18:32:52–18:32:54). Burvick then said, "Oh, I refuse." *Id.* at 3:40–3:42 (Timestamp 18:32:54–18:32:57).

A few moments later, the following exchange occurred between Vanzanten and Burvick:

VANZANTEN:      You said you're a security guard?

BURVICK:        Yes.

VANZANTEN:      Are you a firearm holder as a security guard?

BURVICK:        Yes.

VANZANTEN:      You are a firearm holder. What kind of firearm do you have on you?

BURVICK:        Um, I don't have no firearm on me.

VANZANTEN:      No, no, as far as being a firearm holder.

BURVICK:        I'm working on it.

VANZANTEN:      So you don't have a firearm.

BURVICK:        No. I'm in the process of ...

VANZANTEN:      [interrupting] So you don't have a license to carry.

BURVICK:        No.

VANZANTEN:      You have your security guard license on you?

BURVICK:        Um, I can get it for you.

VANZANTEN:      No, no, I'm saying do you have it on you?

BURVICK:        I can get it for you.

VANZANTEN:      No, no. On you. On your person.

BURVICK:          Yes, I do.

*Id.* at 3:48–4:13 (Timestamp 18:33:03–18:33:28).  The second time Burvick said, "I can get it for you," he made a very slight gesture with his left hand, keeping his arm down by his side but stretching his finger to the side.  Suppression Hr'g Gov. Ex. 2 at 4:24 (Timestamp 18:33:25).

During this initial exchange, at least two people passed by near Burvick and the officers.  One person walked down the street, close to the officers and Burvick, walking in the direction from where the officers came, parallel to the sidewalk.  *Id.* at 3:52–3:54 (Timestamp 18:32:53–18:32:55).  Some moments later, a person with a dog walked down the sidewalk, cutting in between Officer Daguanno and Vanzanten, passing Burvick and continuing down the sidewalk.  *Id.* at 4:07–4:12 (Timestamp 18:33:08–18:33:13).  Although Vanzanten continued to rest a hand on his holstered weapon, none of the officers appeared in any way concerned about the proximity of these passersby to them or to Burvick at any point while they spoke with him.

Following Vanzanten's request for Burvick's security guard license, Burvick removed his wallet from the pant pocket on his right hip.  To do so, he moved the black plastic bag in his right hand to his left hand and held it at the center of his body.  *Id.* at 4:27–4:30 (Timestamp 18:33:27–18:33:31).  Vanzanten was in front of, and partially diagonal to, Burvick.  As Burvick looked through his wallet for the security guard license, Vanzanten shifted his location to be more perpendicular to Burvick and closer to Burvick's right side.  *Id.* at 4:40–4:43 (Timestamp 18:33:41–18:33:44).  When Burvick tried to give Vanzanten his license, Vanzanten removed his

11

right hand from his firearm and pointed to one of the other responding officers, telling Burvick to give the card to that officer. *Id.* at 4:42–4:43 (Timestamp 18:33:43–18:33:45). Vanzanten placed his hand back on the firearm and looked at Burvick's right side. *Id.* at 4:44–4:45 (Timestamp 18:33:45–18:33:46). After providing one of the responding officers his security guard license, Burvick placed his wallet back in his right hip pocket and transferred his black plastic bag back to his right hand. He held the black plastic bag naturally by his right side. *Id.* at 4:48–4:49 (Timestamp 18:33:49–18:33:50). Upon receiving Burvick's security guard license, Officer Charles held it and examined it with Officer Daguanno and took a photo of it. *Id.* at 4:45–5:05 (Timestamp 18:33:46–18:34:06). Officer Daguanno then took the security guard license from Officer Charles and asked for Burvick's date of birth as he examined the license himself, ultimately handing it back to Officer Charles. *Id.* at 5:05–5:17 (Timestamp 18:34:06–18:34:17).

About 45 seconds after Burvick first removed his wallet to give Vanzanten his security card, Vanzanten asked Burvick if he had any other identification on him. *Id.* at 5:12–5:13 (Timestamp 18:34:12–18:34:14). Burvick immediately complied, and again retrieved his wallet from his top right pocket. *Id.* at 5:15–5:19 (Timestamp 18:34:16–18:34:20). After Burvick removed his wallet from his pocket, Vanzanten pointed to Burvick's right cargo pocket, located mid-leg, and asked, "What's that, in your in your (sic) pocket down here that's weighing heavy, down down (sic) here?" *Id.* at 5:19–5:23 (Timestamp 18:34:20–18:34:24). Burvick responded, "My phone and stuff." *Id.* at 5:26–5:27 (Timestamp 18:34:27–18:34:28). Vanzanten said, "Well your

phone is back here," pointing to Burvick's back pocket. *Id.* at 5:28–5:30 (Timestamp 18:34:29–18:34:31). Burvick said he had another phone. *Id.* at 5:29–5:31 (Timestamp 18:34:20–18:34:32). Vanzanten asked Burvick, "Do you mind if I see it?" *Id.* at 5:32–5:34 (Timestamp 18:34:33–18:34:35). Burvick declined. *Id.* at 5:34–5:35 (Timestamp 18:34:35–18:34:36). Vanzanten then looked away from Burvick, at one of the other officers. *Id.* at 5:38 (Timestamp 18:34:39).

During Vanzanten's questioning, upon receiving Burvick's identification, Officer Charles took a photo of Burvick's identification card on his phone and then studied his phone screen, moving his finger in a way suggesting he was scrolling. He looked from the screen to Burvick's identification and back to the screen before handing back Burvick's license. Suppression Hr'g Gov. Ex. 1 at 5:10–6:44 (Timestamp 18:34:25–18:35:58). While not entirely clear from the video, it appears as though Officer Charles was checking for outstanding warrants at this point. *Id.*

As Officer Charles checked Burvick's identification against whatever was on the screen of his phone, Vanzanten turned back to look at Burvick's cargo pocket. Suppression Hr'g Gov. Ex. 2 at 5:42 (Timestamp 18:34:43). Officer Charles gave the security guard license and second piece of identification back to Burvick. *Id.* at 6:55–6:59 (Timestamp 18:35:56–18:36:00).

Throughout the encounter, Vanzanten looked away from Burvick at least 11 times, including one nearly 10 second stretch — interrupted by just one second glancing back at Burvick. During part of that particular stretch, Vanzanten stared at the ground away from Burvick, resting his left hand on the side of his face closest

to Burvick. *Id.* at 6:48–6:58 (Timestamp 18:35:49–18:35:59). Vanzanten also turned away from Burvick to watch a car drive down the road. *Id.* at 6:56 (Timestamp 18:35:57).

After Officer Charles gave Burvick back his two identification cards, he continued looking on his phone. Suppression Hr'g Gov. Ex. 1 at 6:44–6:50 (Timestamp 18:35:59–18:36:04). Officer Charles then looked up at Vanzanten and said, referring to Burvick, "He's good" — an apparent reference to a negative warrant check. *Id.* at 6:50 (Timestamp 18:36:05); Suppression Hr'g Gov. Ex. 2 at 7:04 (Timestamp 18:36:05).

Immediately after being informed that Burvick was "good," Vanzanten asked Burvick to move the plastic bag he was carrying "for a second so I can look at that pocket." *Id.* at 7:06–7:08 (Timestamp 18:36:07–18:36:09). Burvick complied and said "no problem." *Id.* at 7:09 (Timestamp 18:36:10). Vanzanten bent down to look more closely at the exterior pocket. *Id.* Vanzanten then frisked the pocket and handcuffed Burvick with the help of one of the other responding officers. *Id.* at 7:12–7:22 (Timestamp 18:36:14–18:36:23). Officer Charles retrieved a firearm from Burvick's cargo pocket as Vanzanten and Daguanno handcuffed him. Suppression Hr'g Gov. Ex. 1 at 7:14–7:16 (Timestamp 18:36:29–18:36:31).

No outline or shape is visible from Burvick's right cargo pocket from any of the three bodycam videos introduced into evidence. Burvick's hands remained outside of his pockets for the duration of his encounter with the officers, except when retrieving his wallet twice to provide the officers with his identification. Burvick twirled or

jingled his keys in his left hand, by his side, at points throughout the encounter. His demeanor was calm throughout.

After the officers handcuffed him, Officer Daguanno removed additional items from Burvick's cargo pockets, including a second cell phone from Burvick's right cargo pocket (*i.e.,* the same pocket that Burvick had earlier said contained "my phone and stuff"). Suppression Hr'g Def. Ex. A at 9:40–10:44 (Timestamp 18:38:43–18:39:46). While emptying his pockets, Daguanno asked Burvick, "You shooting dice today?" *Id.* at 10:50 (Timestamp 18:39:53). Burvick responded, "Yes."

While Burvick was handcuffed and transported in the police car, Vanzanten's body camera continued to record. During the drive, Burvick asked Vanzanten a question that is not entirely audible, but appears to be an inquiry about the legality of possessing a firearm. Vanzanten responded, "Do you have a license for it if it is legit and in your name?" Suppression Hr'g Gov. Ex. 1 at 13:21–13:23 (Timestamp 18:42:36–18:42:38). Burvick's response is difficult to discern. Vanzanten replied, "Then it's illegal, you know what I mean?" *Id.* at 13:25–13:27 (Timestamp 18:42:40–18:42:42). Vanzanten then continued to engage with and question Burvick. He asked, "I know it might be a stupid question to you, but I'm just curious as to why you're carrying it on you right now." *Id.* at 14:43–14:47 (Timestamp 18:43:59–18:44:02). Though it is difficult to discern Burvick's full response, at one point he says, ". . . for protection." *Id.* at 14:50 (Timestamp 18:44:05). Vanzanten responded, "I understand. That's why it sounds like a dumb question. But you gotta do things the right way." *Id.* at 14:51–14:55 (Timestamp 18:44:06–18:44:11).

15

### B. Suppression hearing testimony

The government's sole hearing witness, Lt. Gary Vanzanten, testified that the radio alert stated no firearm was shown and that the code was for "harassments." Tr. at 44:2–8. According to Vanzanten, a 911 report is written contemporaneously with the radio alert that officers hear. Tr. at 43:23–25, 44:1. Vanzanten confirmed that the 911 report for the call stated that someone was "threatening people *saying* he has a gun," that no gun was shown, and that there were no injuries. Tr. at 45:18–25; 46:4–13 (emphasis supplied).

Vanzanten was "[s]hocked" when Burvick left the gate of his home and complied with Vanzanten's command to "come . . . here." Tr. 23:21; 24:3. Vanzanten affirmed that Burvick "followed [his] command" to approach the officers, though he stated his statement had "more of an inflection[,]" like a question. Tr. at 36:19–20; 38:5. In Vanzanten's assessment, that "wouldn't be the first thing someone with a firearm would do." Tr. at 24:4–7. Indeed, when "[Burvick] walked over to me. . . I just thought that was odd." Burvick's response led Vanzanten to conclude that "maybe the [911] call wasn't truthful." Tr. at 24:19–20.

According to Vanzanten, however, "[i]t became more suspicious" when Burvick subsequently refused to allow the officers to search his pockets, even after initially consenting. Tr. at 25:13. Vanzanten also testified that when he asked Burvick if he had his security guard license, he interpreted Burvick's responses ("I can get it for you") as an indication "that [Burvick] was looking to go inside of his house. And if he

did have any evidence on him, obviously that evidence would be gone if he came back with his license." Tr. at 25:23–26:5.

Vanzanten also testified that his eventual decision to frisk Burvick without his consent was based in part on the "heavy" content(s) of Burvick's pocket and what he interpreted as an attempt on Burvick's part to obscure the contents from view. Tr. 28:11–12; 29:4–5. He explained, "[w]hen Mr. Burvick went to recover his security license, he had to remove the black plastic bag that you can see that's on the side of his right leg. When he did so, I was able to see the cargo pocket pant weighing down heavier, as if there was an object inside there, possibly a firearm." Tr. at 27:14–18. In response to a question about when he was "considering whether there might have been a firearm in [Burvick's cargo] pocket," Vanzanten affirmed that the moment he thought Burvick might have a firearm in that pocket was when he was "shifting [his] location" to be closer to Burvick's right side. Tr. at 29:24–25; 30:1–3. Vanzanten testified that he shifted his position, as observed in the bodycam video, because, "I wanted to get a better look at what was weighing his pocket down so heavy." Tr. at 27:19–21.

To Vanzanten, Burvick's "jingling his keys in his left hand" was "obviously showing a little bit of nervous behavior." Tr. at 28:25–29:2. Prior to the frisk, "we had pretty much summed up our investigation at that point[.]" Yet Vanzanten decided that "I needed to see what was inside that pocket at that point." Tr. at 29:16–18. Vanzanten "asked [Burvick] to move the bag so I could get a better look at it." Tr. at 29:19–20. He "observed the pocket," and even though he did *not* see a firearm-

shaped bulge, he claimed in his hearing testimony that "through my history of getting guns off the street I knew that was a firearm." Tr. at 29:20–21. Vanzanten confirmed that a second phone was found in Burvick's right cargo pocket, and that Burvick's earlier statement that a second phone was in that pocket proved to be true. Tr. at 77:4–19.

*    *    *

Following the hearing, the parties submitted supplemental letters. *See* Gov.'s Sept. 11, 2024 Letter, ECF No. 30; Def.'s Sept. 12, 2024 Letter, ECF No. 31. The government proffered a file containing an audio recording of an exchange between Officer Daguanno and a police dispatcher from July 1, 2023, as an additional exhibit. *See* Gov.'s Sept. 11, 2024 Letter.

The Court heard oral argument on the Motion on October 10, 2024 and, after argument, invited the parties to submit a second round of post-hearing letter briefs on certain issues. *See* Minute Entry for Oct. 10, 2024; Gov.'s Oct. 18, 2024 Letter, ECF No. 33; Def.'s Oct. 18, 2024 Letter, ECF No. 34.

The Court did not rule at that time on whether to admit the audio recording belatedly proffered by the government in its September 11, 2024 letter. It now holds that recording admissible and admits it as Government Exhibit 4. Although the government did belatedly offer this exhibit into evidence only after the hearing, and the defense objects to its admission on that basis, the Court finds that the defense was not prejudiced as a result because the recording had previously been produced in Rule 16 discovery. On the other hand, the Court finds that this recording is of limited probative value on the issues presented in this motion. It concerns a separate phone

18

conversation between the police dispatcher and Officer Daguanno, whom the government did not call to testify at the hearing and who, unlike Lt. Vanzanten, did not make the decisions to seize or frisk Burvick.

## **DISCUSSION**

On a motion to suppress, the defendant bears the burden of proving the facts necessary to proceed with the motion. *See United States v. Masterson*, 383 F.2d 610, 614 (2d Cir. 1967). Once the defendant "has established some basis for the motion, then the burden shifts to the government to show that the search was lawful." *United States v. Rucker*, 32 F. Supp. 2d 545, 551 (E.D.N.Y. 1999) (ILG) (citing *United States v. Sacco*, 563 F.2d 552 (2d Cir. 1977)).

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Where the defendant's motion asserts a Fourth Amendment violation, the Court must determine whether the defendant was seized for purposes of the Fourth Amendment and whether there was the required level of suspicion to justify the seizure. *See United States v. Weaver*, 9 F.4th 129, 138–42 (2d Cir. 2021).

The Court first discusses when Burvick was seized for purposes of the Fourth Amendment during his encounter with law enforcement, finding that Burvick was so seized at the latest when Vanzanten asked for Burvick's security guard license after the initial questioning. The Court next examines whether Vanzanten had the required reasonable suspicion for that seizure, and finds he did not, thereby invalidating the subsequent frisk. Finally, though the Court holds that Burvick was unlawfully seized prior to the frisk, it nonetheless examines whether — even

assuming the seizure was constitutional — the officers had reasonable suspicion that Burvick was armed and dangerous as required to justify the frisk, and finds that they did not.

## I.     When was Burvick seized for purposes of the Fourth Amendment?

Burvick argues that he was seized for purposes of the Fourth Amendment at the beginning of his interaction with the officers — when Vanzanten told him to "come here" after Burvick had already entered the gated front yard to his residence and when Burvick complied, coming onto the sidewalk so that he could be questioned by the police. Mot. at 13–14. Burvick further argues that because Vanzanten ordered him to leave the "curtilage," or the area "immediately surrounding and associated with the home," the officers' stop was subject to heightened Fourth Amendment scrutiny that required probable cause and/or a warrant to stop Burvick. *Id.* at 20–22; *see Florida v. Jardines*, 569 U.S. 1, 6 (2013) (defining the "curtilage" "as part of the home itself for Fourth Amendment purposes" (internal quotation marks omitted)). The government does not claim that the officers had probable cause, but argues that Burvick voluntarily exited the yard to speak with the officers, and that Burvick was not seized for purposes of the Fourth Amendment at that point. Opp'n at 12, 16–17. While the government does not address whether Fourth Amendment scrutiny is more demanding when contact with law enforcement occurs in the curtilage of a person's home, it argues that Vanzanten did not coerce Burvick to leave the area surrounding his residence and that nothing in the record suggests that

Vanzanten asked Burvick to leave his front yard and "come here" in order to decrease his constitutional protections.  *Id.* at 16–17.

The Court need not reach the novel question raised by Burvick — whether the Fourth Amendment requires probable cause or a warrant for officers to direct a person to leave the curtilage of her home to answer questions about a criminal investigation — because the Court finds that, at the latest, Burvick was seized for purposes of the Fourth Amendment at the moment when Vanzanten asked him for his security guard license during their encounter.   And at that point, the officers lacked the required reasonable suspicion to justify the seizure — *i.e.,* they did not have an objectively reasonable basis to believe that Burvick had committed, or was about to commit, a crime.

A seizure for purposes of the Fourth Amendment occurs when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (quoting *U.S. v. Mendenhall*, 466 U.S. 544, 554 (1980)).   Where physical force is absent, a seizure occurs where there is "*submission* to the assertion of authority" by the defendant.  *Id.* at 626.  The test of what constitutes "a 'show of authority' is an objective one:  not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  *Id.* at 628.  Another way to phrase the inquiry, especially when a person may not be "free to leave" for reasons unrelated to the government action, is "whether a reasonable person would feel free to decline the officers' requests

21

or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *see Brendlin v. California*, 551 U.S. 249, 254, 263 (2007) (finding seizure of passenger in car stopped by police even when police were targeting driver).

Determining when and whether a seizure occurred requires a "contextual approach" that "take[s] into account '"all of the circumstances surrounding the incident"'" in each individual case." *Michigan v. Chesternut*, 486 U.S. 567, 572–73 (1988) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)).  The inquiry "assess[es] the coercive effect of police conduct, taken as a whole, rather than . . . focus[ing] on particular details of that conduct in isolation." *Id.* at 573.  The test uses an "objective standard — looking to the reasonable [person's] interpretation of the conduct in question." *Id.* at 574.  The "subjective intent of the officers [involved] is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." *Id.* at 575 n.7.

Police-citizen interactions that begin as consensual encounters can become seizures as they progress.  While voluntary interactions between the police and an individual are not a "seizure" under the Fourth Amendment, "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Delgado*, 466 U.S. at 215 (quoting *Mendenhall*, 446 U.S. at 554).  In one instance, a plurality of the Supreme Court found that officers' "[a]sking for and examining [a defendant's] ticket and his driver's license were no

doubt permissible in themselves," but when those officers "identified themselves as narcotics agents, told [the defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart," that individual "was effectively seized for the purposes of the Fourth Amendment." *Florida v. Royer,* 460 U.S. 491, 501 (1983). The concurring Justice in that case would have held the seizure for purposes of the Fourth Amendment occurred even earlier — once "an officer has identified himself and asked a traveler for identification and his airline ticket." *Id.* at 511 (Brennan, J. concurring); *compare Florida v. Rodriguez,* 469 U.S. 1, 5–6 (1984) (finding no seizure for purposes of the Fourth Amendment where officers asked defendant whether he would step aside and talk to them, but not deciding whether a seizure occurred when the defendant agreed to talk, moved to where other detective was standing, and granted permission for officers to search his baggage).

In Burvick's case, a reasonable person would interpret Vanzanten's saying "come here for a second" as more than a simple question, but instead as a firm and potentially urgent directive, given the pace at which Vanzanten and the other two officers were traveling down the street and the tone of Vanzanten's voice. At the suppression hearing, Vanzanten himself affirmed that Burvick "followed [his] command" to approach the officers, though he later stated his statement was "more of an inflection," like a question. Tr. at 36:19–20; 38:5. On the other hand, Burvick had the option to reject Vanzanten's directive, even if he may not have realized he

had that right.  For law enforcement officers "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, [or] by asking him if he is willing to answer some questions." *Royer*, 460 U.S. at 497.  Even though "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Delgado*, 466 U.S. at 216.  Thus, although this Court finds that Vanzanten's statement to "come here" could reasonably be construed as an official "command," Burvick's compliance did not alone transform it into a seizure for the purposes of the Fourth Amendment at that point.

As the encounter progressed, however, it plainly "transformed into a seizure or detention within the meaning of the Fourth Amendment." *Delgado*, 466 U.S. at 215. This is because "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (quoting *Mendenhall*, 446 U.S. at 554).

The Second Circuit has identified specific factors that guide this inquiry. Circumstances that will transform a consensual encounter with police into an involuntary seizure include "the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room." *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990).

In other cases, the Second Circuit has found no Fourth Amendment seizure where plainclothes officers approached and questioned a suspect without showing weapons and spoke to the suspect in a tone that was "neither threatening nor offensive." *Id.*; *see also United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991) (finding no seizure where single officer initially approached defendant in plainclothes, displayed no weapon, made no show of force, did not touch defendant, and conversation was not intimidating or coercive); *United States v. Torres*, 949 F.2d 606, 608 (2d Cir. 1991) (finding no seizure where defendant approached plain clothed police officer, initiated contact, agreed to follow officers into room for questioning, and consented to search of his bag); *United States v. Madison*, 936 F.2d 90, 93 (2d Cir. 1991) (finding no seizure where an officer questioned defendant on a public bus, "did not display his weapon," "did not touch [defendant]," "spoke to [defendant] in a 'conversational and polite' tone," "did not ask to see [defendant's] ticket or any identification," and was in plain clothes, as was the other officer present — who did not identify herself as police officer).

Burvick's encounter with the police was quite different. The officers who spoke with Burvick were three in number, wore police uniforms, and had their weapons displayed. Vanzanten, the lieutenant who was clearly in charge of the investigation, rested his hand on his firearm for nearly the entire encounter. Moreover, while the conversation was not "threatening or offensive," it began with what an objectively reasonable person would interpret as a directive to turn around, step away from the entrance to his own home, and speak with the officers.

Even if an objectively reasonable person in Burvick's shoes might have felt free to terminate the encounter early on, that calculus quickly changed as the questioning progressed. Within the first seconds after Burvick met the officers on the street, Vanzanten asked Burvick if he was "having any problems with anybody earlier, a couple minutes ago." Suppression Hr'g Gov. Ex. 1 at 2:57–3:00 (Timestamp 18:32:12–18:32:15). Within the first minute of the encounter, Vanzanten told Burvick that an unnamed person was "calling 911 on [him]" and that Burvick "fit the description" of whomever the caller had accused. *Id.* at 3:10–3:26 (Timestamp 18:32:25–18:32:41). Vanzanten then asked, "You don't have anything on you you're not supposed to have on you, any weapons or anything like that?" *Id.* at 3:27–3:29 (Timestamp 18:32:42–18:32:44).

When police tell a person that he is suspected of a serious crime, it "might arguably be construed as an indication that [they] [were] not free to leave." *Lee*, 916 F.2d at 819. In *Lee*, where the officers were in plain clothes, did not display weapons, did not speak in a threatening or offensive manner, and did not impede the movement of the defendant, the Second Circuit was "unconvinced that *this single statement* transformed an otherwise consensual encounter into a [F]ourth [A]mendment seizure." *Id.* (emphasis supplied). Instead, "[v]iewing the statement in context, it is clear that the officer — in response to [the defendant's] own inquiry" about why he was being questioned — "was merely verbalizing something that was already quite obvious from the circumstances." *Id.* But here, unlike in *Lee*, when Vanzanten began asking Burvick questions about his work history, his license status, and whether he

26

was carrying a firearm or anything else he was "not supposed to have," he was not "merely verbalizing something that was already quite obvious from the circumstances." *Id.* Burvick was on his way into his home when they approached him; there was no ongoing emergency; and there was no reason apparent to a reasonable person, presumed innocent, that the officers would suspect him of carrying an illegal firearm or committing any other crime.

A reasonable person might well have believed they were unable to terminate the encounter even during this initial — and fairly detailed — questioning about Burvick's employment, license status, and activities that day. But the Court need not decide whether that is the case, because it is clear that at the very latest, Burvick was "seized" when Vanzanten followed those biographical questions by asking Burvick to hand over his security guard license for the officers' inspection. Indeed, at that point, Vanzanten had done more than simply ask Burvick some basic biographical questions. He had also asked Burvick if he could search his person (a request to which Burvick initially consented, at which point Vanzanten suddenly changed course and told Burvick he could "refuse" the search he had just agreed to, leading to Burvick withdrawing his consent). Suppression Hr'g Gov. Ex. 1 at 3:38–3:42 (Timestamp 18:32:52–18:32:57). Clearly unappeased by Burvick's answers and suspicious of his (invited) "refus[al]" to allow a warrantless search of his person, Vanzanten then asked Burvick to show the officers his security guard license. *Id.* at 3:48–4:13 (Timestamp 18:33:03–18:33:28). At that point, no objectively reasonable person would think they could simply terminate this extended encounter with three

armed police officers and walk away.  The "coercive effect of police conduct" reached a level where any reasonable person would understand they were suspected of a crime, that their responses to the police were thus far unsatisfactory, and that they could not leave or terminate the questioning.  *Chesternut*, 486 U.S. at 573.

## II.    At the time Burvick was seized, did the police have reasonable suspicion?

Once the Court determines that a seizure for purposes of the Fourth Amendment occurred, the next inquiry is whether the officers had the required level of suspicion to make that seizure under the Fourth Amendment.  Warrantless arrests are seizures that require probable cause.  *See District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018); *U.S.A. v. Ceballos*, 812 F.2d 42, 49 (2d Cir. 1987) (holding police stop was an arrest and therefore required probable cause).  There are, however, "seizures" short of arrests that do not require probable cause and may be justified by a lower quantum of suspicion.

In *Terry v. Ohio*, the Supreme Court recognized a "narrowly drawn authority" allowing officers to briefly detain a person reasonably suspected of criminal activity without probable cause or a warrant, as well as to "conduct a carefully limited search of the outer clothing" of a person "in an attempt to discover weapons which might be used to assault [the officer]."  392 U.S. 1, 27, 30 (1968).  A *Terry* stop is permissible when an officer:

> observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and

> where nothing in the initial stages of the encounter serves to dispel his
> reasonable fear for his own or others' safety.

*Id.* at 30.  And while "[t]he officer need not be absolutely certain that the individual is armed[,] the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *Id.* at 27. In so holding, the *Terry* Court underscored that "[t]he sole justification of the search . . . is the protection of the police officer and others nearby."  *Id.* at 29.

The level of suspicion for a *Terry* stop is less than probable cause, but closely tied to its original, limited purpose.  The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Id.* at 21.  The acts are "judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"  *Id.* at 21–22.  "[I]narticulate hunches" and "simple 'good faith on part of the arresting officer'" are not enough.  *Id.* at 22. (quoting *Beck v. Ohio*, 379 U.S. 89, 97 (1964)).

Since *Terry,* the Supreme Court has gone on to authorize certain other warrantless seizures based only on reasonable suspicion, rather than probable cause. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."); *United States v. Brignoni-Ponce,* 422 U.S. 873, 881 (1975) (holding that pursuant to *Terry* and *Adams* "in appropriate

circumstances," including stops of cars suspected of transporting undocumented immigrants at border, "the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause" and that such stops require reasonable suspicion); *see also U.S. v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) ("Reasonable suspicion must arise *before* a search or seizure is actually effected." (emphasis in original) (quoting *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005)).

Thus, for the seizure of Burvick to be constitutional, the officers must have had an objectively reasonable basis to believe that "criminal activity [was] afoot." *See Weaver*, 9 F.4th at 139. And for the subsequent frisk of Burvick to be constitutional, Vanzanten must have had reasonable suspicion "not only that criminal activity [was] afoot, but also that [Burvick] [was] 'armed and dangerous.'" *Id.* (quoting *Terry*, 392 U.S. at 30).

Whether police had reasonable suspicion for a seizure turns on the "totality of circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). The parties focus on certain factors in their briefing and argument on this issue. Though the Court discusses these factors one by one, ultimately, they are assessed as a whole in the totality of circumstances surrounding Burvick's seizure.

### A. The 911 call

Burvick argues that the 911 call that led the officers to stop, question, and ultimately frisk him was both anonymous and unreliable. He argues that the call involved only uncorroborated allegations about threats and the suspect's possible

30

possession of a firearm, while at the same time making clear that the person whom the caller sought to accuse did not actually display a firearm.  Mot. at 14–15.  The government argues that the 911 call was not fully anonymous, gave rise to a time-sensitive allegation that the officers needed to (and did) respond to promptly, and had sufficient indicia of reliability to provide reasonable suspicion that Burvick had committed a crime.  Opp'n at 12–13.

To begin, the parties disagree as to whether the 911 caller who accused Burvick can fairly be described as "anonymous."  That the parties' positions diverge on this point is unsurprising, since it is well established that anonymous tips are "generally less reliable than tips from known informants."  *See Florida v. J.L.*, 529 U.S. 266, 268–269 (2000) (citation omitted) (finding that "an anonymous tip that a person is carrying a gun, without more," is not "sufficient to justify a police officer's stop and frisk of that person"); *see also Navarette v. California*, 572 U.S. 393, 397 (2014) (noting that "an anonymous tipster's veracity is by hypothesis largely unknown" (internal quotation marks omitted)); *Alabama v. White*, 496 U.S. 325, 328 (1990) (identifying specific factors to assess whether an anonymous call provides sufficient indicia of reliability to justify a stop and frisk).

Here, the government's claim that the call in question was not truly "anonymous" is substantially undermined by the fact that the police appear to have viewed it as such, and with good reason.  The police dispatcher who conveyed information from the 911 call characterized it as anonymous.  *See* 911 Report at 10; Suppression Hr'g Def. Ex. C, Unredacted 911 Report.  As the officers followed Burvick

31

down the street before stopping him, Vanzanten asked his fellow officer, "It's an anonymous caller?" and upon his fellow officer's affirmative response, said "Fuck." Suppression Hr'g Gov. Ex. 1 at 2:05–2:09 (Timestamp 18:31:20–18:31:24). Though Officer Daguanno was on the phone and at one point said, "Your name is D-E-E?" that question followed an earlier exchange in which the caller was reluctant to give her name. Suppression Hr'g Gov. Ex. 1 at 2:30–2:31 (Timestamp 18:31:44–18:31:46); Suppression Hr'g Def. Ex. A at 2:42–2:43 (Timestamp 18:31:45–18:31:46). Before asking if "Your name is D-E-E," Daguanno said, "What's your name, miss?" and then, "Okay, well, without giving your name we can't stop him, so." Suppression Hr'g Gov. Ex. 1 at 2:15–2:18, 2:22–2:24 (Timestamp 18:31:30–18:31:32; 18:31:37–18:31:39); Suppression Hr'g Def. Ex. A, Officer Daguanno Bodycam Footage at 2:27–2:30, 2:34–2:37 (Timestamp 18:31:30–18:31:32; 18:31:37–18:31:40).

Moreover, even if Vanzanten believed Daguanno was on the phone with the 911 caller, it is unclear how much of Daguanno's comments Vanzanten heard before stopping Burvick. Indeed, after he told Burvick to "come here," Vanzanten told Daguanno to "keep talking." Suppression Hr'g Def. Ex. A at 3:05–3:06 (Timestamp 18:32:08–18:32:09). If Vanzanten heard Daguanno's dialogue on the phone, the exchange should only have added to Vanzanten's reservations about the caller's reliability. The obvious takeaway from Daguanno's exchange is that the caller declined to provide her full name, even after being directly asked for it; at most, she may have provided what could have been a first name, a nickname, a last name, or

an alias, and only did so after Officer Daguanno told her that, without a name, the officers would not be able to stop the person she had accused.

Indeed, it came to light at the suppression hearing that ultimately there was no name at all listed for the caller — not even a first name — in the official records of the incident. Tr. at 3–4. And while the dispatcher's recorded call with Officer Daguanno (belatedly proffered by the government only after the evidentiary hearing) provides some indication that the caller was willing to participate in a follow-up interview with the officers, *see* Gov. Ex. 4, that proffer is undermined by the caller's reluctance to even give her full name while speaking with Daguanno on the phone. Similarly, though the dispatcher did have a phone number for the 911 caller, this alone does little to establish reliability. As the Second Circuit in *United States v. Freeman* reasoned:

> [t]he fact that the . . . caller's apparent cell phone number is known does not alter the fact that the identity of the caller is still unknown, leaving no way for the police (or for the reviewing court) to determine her credibility and reputation for honesty — one of the main reasons tips from known sources are afforded greater deference than anonymous ones. Moreover, while the government argues that the fact that her number is known would now allow police to track her down, and thus she could be open to the consequences of false reporting, she never has been tracked down, so there is no way for this Court to determine that the number actually would trace back to the individual who made the phone call. There is nothing offered to suggest, for example, that the phone was not a prepaid phone, which would be as anonymous as a call placed from a public pay phone.

735 F.3d 92, 98 (2d Cir. 2013) (citation omitted).

In *Navarette v. California,* the Supreme Court identified some of the indicia of reliability that might permit an anonymous call to establish reasonable suspicion;

they include eyewitness knowledge, contemporaneous reporting, reports of an ongoing emergency, and use of the 911 emergency system. *Navarette*, 572 U.S. at 395, 399–401.[3]    The 911 call that led to officers' stop of Burvick was a contemporaneous account upon alleged eyewitness knowledge and used the 911 system, but the caller did not report an ongoing emergency. No firearm was shown, and the dispatcher's code was merely for "harassments." Tr. at 44:2–8. It is true that the contemporaneous 911 report said that someone was "threatening people saying he has a gun." Tr. at 46:4–7. But the report twice stated that no gun was shown, and made clear that there were no injuries to the caller or anyone nearby. Tr. at 45:18–25; 46:4–13. That the 911 caller did not describe a person threatening her (or anyone else) with a gun, did not see a weapon at all, and did not describe with any specificity what she meant when she accused the suspect of "threatening people," makes this case readily distinguishable from *Navarette* — itself a "close case" in which the Supreme Court ultimately found reasonable suspicion only after concluding that the

---

[3] In *Navarette*, based on an anonymous 911 call, the county dispatcher relayed information to two officers, the details of which included the direction the car was traveling, the highway it was on, the mile marker it was near, the color and model of the car, the license plate number, and that the car "[r]an the reporting party off the roadway and was last seen approximately five [minutes] ago." *Id.* at 395, 399, 401. The Court found that "the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving"; that the police-confirmed location of the vehicle less than twenty minutes after the call "suggest[ed] that the caller reported the incident soon after she was run off the road"; and that the behavior alleged by the caller "'viewed from the standpoint of an objectively reasonable police officer, amount[ed] to reasonable suspicion' of drunk driving." *Id.* at 399–402 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

34

911 caller had reported not an "isolated example of recklessness" but "dangerous conduct that could have disastrous consequences."

Indeed, the call that prompted the officers to stop Burvick is far closer to the anonymous call in *Florida v. J.L.* In *J.L.*, an anonymous caller reported to the Miami-Dade police that a young Black male wearing a plaid shirt and standing at a bus stop was carrying a gun. *J.L.*, 529 U.S. at 268. The Supreme Court held that the call was insufficient to justify a stop and frisk of that person because it had "no predictive information," and though "the allegation about the gun turned out to be correct," that did "not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct," as "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271. Though the Court noted that "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in th[e] limited sense" of "help[ing] the police correctly identify the person whom the tipster means to accuse, . . . [s]uch a tip . . . does not show that the tipster has knowledge of concealed criminal activity." *Id.* at 272. Instead, "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* The 911 caller did not even claim that Burvick was carrying a gun; instead, she merely alleged that he "said" that he "had" one. Though Burvick matched her physical description precisely and was near the area she described, it "does not show that the tipster had knowledge of

criminal activity." *Id.* For despite "its tendency to identify a determinate person," the call was not, on its own, "reliable in its assertion of illegality." *Id.*

Similarly, in *United States v. Freeman*, an unknown caller phoned 911 twice, providing a physical description of a man she said had a gun and a location to find him. The first dispatch officer conveyed that "'a person is possibly armed with a firearm' and was 'arguing with a female.'" *Freeman*, 735 F.3d at 94. The second radio dispatch indicated the same caller had called back and clarified the man's physical description and provided an update on where the man was "walking towards." *Id.* at 95. But the Second Circuit held that, though the phone number was recorded, the call nevertheless bore the unreliability of an anonymous tip and was insufficiently reliable to provide reasonable suspicion for the stop. Indeed, "[t]he fact that the anonymous call here was more detailed as to physical description and location" compared to the call in *J.L.* "does not alter the fact that such details merely serve to 'correctly identify the person whom the tipster means to accuse'" and "does nothing to 'show that the tipster has knowledge of concealed criminal activity.'" *Id.* at 99 (quoting *J.L.*, 529 U.S. at 272). Importantly — just as in Burvick's case — in *Freeman,* "the officers' own testimony indicate[d] that such a radio call is indicative of an individual *possibly* having a gun." *Id.* at 101. But the *Freeman* Court reasoned that, were it to hold that such accusations are sufficient to establish reasonable suspicion that someone *actually* has a gun, it would "create the very firearm exception" to the protections against unreliable 911 calls "that the [Supreme] Court rejected in *J.L.*" *Id.*; *see J.L.*, 529 U.S. at 272 (holding that "an automatic firearm

exception to our established reliability analysis would rove too far" and "enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun").

Similarly, in *U.S. v. Muhammad*, 463 F.3d 115, 122 (2d Cir. 2006), which involved an anonymous call where the informant "proffered that she had seen the gun in the bicyclist's hand," the Second Circuit rejected the call as insufficient grounds for a stop, since "the only aspects of the caller's information that were corroborated by [the officers'] initial observations were that a black man in white clothing was riding a bicycle on a particular street." The call required additional indicia of reliability, "such as the provision of information predictive of activity suggesting criminal involvement, or prior experience with the particular informant." *Id.* By contrast, where the Second Circuit did find an anonymous call reliable due to its contemporaneous report of an ongoing emergency, that emergency reported was far more urgent and specific than the alleged crime reported here: that an "assault, possibly with a weapon, was in progress at a nearby apartment building." *United States v. Simmons*, 560 F.3d 98, 101, 105 (2d Cir. 2009).

As such, the unknown caller's accusation here was insufficiently reliable to justify Burvick's seizure. At most, it only alerted police to unspecified "threatening" behavior against unknown "people" by "an individual possibly having a gun," *Freeman*, 735 F.3d at 101, with no ongoing emergency. That is a far cry from the ongoing assault in *Simmons* or from the fear that a drunk driver was at active risk

of harming others in *Navarette*. 560 F.3d at 101; 572 U.S. at 403–404. Though the caller provided a detailed physical description (which unquestionably fit Burvick, and was no doubt meant to accuse him), the call did not include reliable "information predictive of activity suggesting criminal involvement," nor did law enforcement have "prior experience with the particular informant." *Muhammad*, 463 F.3d at 122; *see also Freeman*, 735 F.3d at 98 (finding anonymous call unreliable even where government argued caller provided "physical description [that] was more detailed . . . than that in J.L." and where caller "reflected [suspect's] 'precise and changing location'").

Finally, it is worth noting that the officers apparently understood that they may have lacked reasonable suspicion to stop Burvick, let alone frisk him, based on the 911 call and his subsequent movement. When Vanzanten learned the caller was anonymous, he said "Fuck," and later told Officer Daguanno to keep talking to the person on the phone with him as they approached Burvick — presumably to get more information from or about the anonymous caller and her accusations before they tried to seize him. Suppression Hr'g Gov. Ex. 1 at 2:05–2:09 (Timestamp 18:31:20–18:31:24); Suppression Hr'g Def. Ex. A at 2:17–2:29 (Timestamp 18:31:19–18:31:23), 3:05–3:06 (Timestamp 18:32:08–18:32:09). While on the phone with the caller, Officer Daguanno told her, "without giving your name we can't stop him." Suppression Hr'g Def. Ex. A at 2:34–2:37 (Timestamp 18:31:37–18:31:40). That the caller may have told Officer Daguanno her name was "D-E-E" does not satisfy the government's burden. If anything, providing "D-E-E" — only after being told the officers could not

stop Burvick without her name, and with no evident explanation of "D-E-E" being a last name, first name, or nickname — only cast additional doubt on the caller's willingness to identify herself and, in turn, her reliability. Though the relevant inquiry is an objective one, the supervising lieutenant's verbal recognition that he may have lacked grounds to even stop Burvick for questioning based on the 911 call alone is consistent with this Court's assessment that — combined with the additional factors discussed *infra* — the officers lacked an objectively reasonable basis to seize him at the time they did so.

### B. Burvick's withdrawn consent to a voluntary search of his person

When he was being questioned by Vanzanten, Burvick initially consented to a search of his person, answering "No problem" when Vanzanten asked if he could search Burvick's person. Suppression Hr'g Gov. Ex. 1 at 3:34–3:37 (Timestamp 18:32:49–18:32:52). After Burvick consented, Vanzanten said, "You don't have to. . . you can refuse." *Id.* at 3:37–3:40 (Timestamp 18:32:52–18:32:55). Only then did Burvick reply, "Oh, I refuse." *Id.* at 3:40–3:42 (Timestamp 18:32:55–18:32:57).

At the suppression hearing, Vanzanten testified that when Burvick originally consented, he "thought that was odd" given the allegations in the 911 call. Vanzanten then realized that "maybe the call wasn't truthful." Tr. at 24:19–20. But when Burvick then withdrew his consent to a pat-down search upon Vanzanten's own invitation, "[i]t became more suspicious." Tr. at 25:13. Having reviewed the bodycam footage and observed Vanzanten's demeanor during his testimony as he described what transpired in those moments, it is clear to this Court that Burvick's decision not

to consent to a search of his person factored heavily in Vanzanten's assessment of what to do next, *i.e.,* to extend their interaction beyond a brief investigatory stop and into a full-blown *Terry* stop (and, later, in his eventual decision to frisk Burvick without his consent).

However, it is well established that a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick*, 501 U.S. at 437; *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (holding that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business," and "any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure" (internal quotation marks omitted)); *Freeman*, 735 F.3d at 102 (holding that officers did not have reasonable suspicion to stop defendant even after he did not stop when asked and shrugged off officers who touched his arm).

Applying those principles here, the fact that Burvick declined to allow a voluntary search of his person is not a factor upon which the government can properly rely to establish reasonable suspicion for the seizure (or, as discussed *infra,* for the subsequent frisk).  First, the refusal came after Burvick initially and immediately consented to the search, telling Vanzanten "no problem."  As Vanzanten testified, that initial response was seemingly at odds with how he believed someone who had just committed the conduct described in the 911 call would act.  And Burvick's subsequent refusal — which followed his initial and immediate consent — was clearly

responsive to Vanzanten's telling him he had the right to refuse the search, and was not indicative of suspicious activity. Indeed, to a reasonable person in Burvick's circumstances, Vanzanten's statement could well be confusing. It might be seen by some who are unfamiliar with Fourth Amendment law as an invitation, or even a subtle suggestion, by the officer to revoke consent to the search — otherwise, the person might wonder, why would the officer advise, "you can refuse" immediately *after* he or she gave his consent to the officer's request?

Nor is Burvick's refusal to consent to a search equivalent to "unprovoked flight," which the Supreme Court has held is different from "a mere refusal to cooperate." *Wardlow*. 528 U.S. at 125. Burvick's refusal is also very different from cases that have held that a defendant's refusal to remove his hands from his pockets upon request from police could provide reasonable suspicion. *Simmons*, 560 F.3d at 108–09 (holding that defendant's "refusal to remove his hands" from pockets is "unlike the mere 'refusal to cooperate, [that] without more, does not furnish the minimal level of objective justification required for a detention or seizure'" and along with other factors, established reasonable suspicion he was concealing weapon) (quoting *Bostick*, 501 U.S. at 437); *United States v. Moore*, No. 21-CR-270 (WFK), 2022 WL 17250548, at *1 (EDNY Nov. 28 2022) (finding officers had reasonable suspicion to search defendant where, among other factors, he "repeatedly refused to remove his hands from his [pockets], as if hiding something"). Here, Burvick's hands were always outside of his pockets and clearly visible to the officers. His demeanor and body language remained calm, respectful, and responsive to the officers'

questions throughout the encounter.  Indeed, prior to the moment that he accepted Vanzanten's express invitation to "refuse" the search, Vanzanten himself had (quite reasonably) begun to wonder whether the 911 caller's accusation — which described a threatening and potentially violent person who would likely present with a wholly different affect, demeanor, and body language than Burvick — "wasn't truthful."

In sum, the fact that Burvick refused to allow a voluntary search of his person, after initially consenting to it, does not establish reasonable suspicion, either alone or in combination with the other factors present here.  And it certainly did not objectively warrant the heavy reliance that Vanzanten placed on Burvick's refusal in his testimony.

## C. Additional factors

The government also argues that "a range of evasive, nervous, and furtive behavior by the defendant, both before and during questioning" provided reasonable suspicion.  Opp'n at 12.  As his "evasive" behavior, the government pointed to how "[o]ne of the officers spotted the defendant turning the corner from Saratoga Avenue to MacDonough Street within a minute of leaving his car, and the 911 operator reinforced that identification by relaying that the defendant 'turned the corner as soon as he saw [the officers] coming.'"  *Id.* at 13.  First, given the 911 call's lack of indicia of reliability, Burvick's walking around the corner where the anonymous caller alleged he was would not alone give rise to reasonable suspicion to stop him. In any event, any arguable suspicion about possible flight based on the route he walked would have quickly been dispelled when Burvick calmly and readily complied

with Vanzanten's command to "come here for a second" and his subsequent responses to the officers' questions.  Suppression Hr'g Gov. Ex. 1 at 2:45–2:51 (Timestamp 18:32:00–18:32:06).  As Vanzanten testified, he was "[s]hocked" when Burvick complied with his directive, because "that wouldn't be the first thing someone with a firearm would do."  Tr. at 24:3–7.  When "he walked over to me...I just thought that was odd, maybe the call wasn't truthful."  Tr. at 24:19–20.  While Vanzanten's subjective response does not control the analysis here — as the standard is what an objective, reasonable officer would conclude under the circumstances — his assessment does align with what is, in fact, an objectively reasonable assessment of Burvick's conduct.

Indeed, Burvick did the opposite of evade the police, and his behavior stands in stark contrast with evasive behavior that courts have considered supporting reasonable suspicion.  *See Florida v. Rodriguez*, 469 U.S. 1, 4, 6 (1984) ("Respondent's strange movements"—"his legs . . . pumping up and down very fast and not covering much ground, . . . as if the person were running in place" supported reasonable suspicion for stop); *United States v. Villegas*, 928 F.2d 512, 514–516 (2d Cir. 1991) (Defendant who officers observed driving at high speeds and driving slowly was "driving in a way that indicated a desire to evade surveillance" that supported reasonable suspicion).

Vanzanten also testified that Burvick's "jingling his keys in his left hand" was "obviously showing a little bit of nervous behavior."  Tr. at 29:1–2.  But that does not alone nor in the totality of circumstances establish reasonable suspicion.  Burvick

was surrounded by three uniformed police officers whose guns were visible.  They told him someone called saying he was threatening that person with a gun.  They asked for his identification.  The jingling of keys, and the behavior of Burvick thus far up until the actual seizure, is notably different from the sort that courts have cited to support a finding of reasonable suspicion.  *See United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018) (finding that nervous behavior "illustrated by [ ] avoidance of eye contact with [the] [o]fficer . . . and visibly shaking hands" provided reasonable suspicion).

Indeed, even if the Court agreed with Vanzanten's interpretation of Burvick's jingling of his keys as a sign of nervousness, it is hardly surprising that a person may become mildly nervous — even if innocent of any wrongdoing — where they find themselves in an unexpected street encounter with three officers like this one.  At the time he began "jingling" his keys, Burvick had been directed to step away from the entrance to his own home by an armed and uniformed officer who was accompanied by two other armed and uniformed officers, and who kept his hand on his firearm for much of the encounter; had been informed that an unidentified person had called 911 and alleged he committed a crime; and had been questioned in considerable detail about his whereabouts, employment, and other matters.  In this context, the fact that a person may show some mild display of nervousness is not an objectively reasonable indication that he or she is engaged in criminal activity.[4]

---

[4] Such mild nervousness is especially reasonable, even for one innocent of wrongdoing, given the distinct possibility that a police-citizen encounter could go awry.  *See generally* University of Illinois Chicago Law Enforcement Epidemiology

Next, the government argues that "inconsistent and suspicious statements made by the defendant during the conversation" with Vanzanten in part provided the officers with reasonable suspicion for the stop. Gov. Opp. at 11–12. On the contrary, Burvick offered plausible and responsive answers, particularly in light of the at-times-confusing nature of Vanzanten's questions.

The government argues that "[t]he . . . inconsistent answers about his possession of a firearm likely heightened Vanzanten's suspicion." *Id.* at 14. The government posits that "the defendant first stated that he did hold a firearm in connection with his employment as a security guard," then "quickly answered the officer's question about what firearm he used by saying 'I don't have no firearm on me,'" and then repeated that he didn't carry a firearm "even when the officer clarified he was asking about the defendant's general use in connection with his employment." *Id.*

The government miscasts what occurred. It is clear that one of Vanzanten's first questions for Burvick was, "You don't have anything on you you're not supposed to have on you, any weapons or anything like that?" Sup. Hrg. Gov. Ex. 1 at 3:27–

---

Project, *U.S. Data on Police Shootings and Violence*, https://policeepi.uic.edu/u-s-data-on-police-shootings-and-violence/ [https://perma.cc/H5MP-M9WN] (last accessed Jan. 2025) (reporting that approximately one million people per year experience threatened or actual use of force during police encounters, with an estimated 250,000 people injured by law enforcement each year); Jeffrey A. Fagan & Alexis D. Campbell, *Race and Reasonableness in Police Killings*, 100 B.U. L. Rev. 951, 951 (2020) (finding that Black suspects are more than twice as likely to be killed during encounters with police than are persons of other racial or ethnic groups, "even when there are no other obvious circumstances during the encounter that would make the use of deadly force reasonable").

3:29 (Timestamp 18:32:42–18:32:44).    After Vanzanten asked if Burvick was a firearm holder as a security guard, his next question is not entirely audible, but appears to be, "You are a firearm holder. What kind of firearm do you have *on you*?" *Id.* at 3:53–3:54 (Timestamp 18:33:07–18:33:08) (emphasis supplied).    Burvick then replied, "Um, I don't have no firearm on me." *Id.* at 3:55–3:56 (Timestamp 18:33:10–18:33:11).    The Court finds that Burvick did not "quickly answer[ ]" Vanzanten's question, which could reasonably be interpreted as a question about whether Burvick had a firearm on him *at that time*.    In fact, Burvick paused before providing his answer:

VANZANTEN:    You said you're a security guard?

BURVICK:    Yes.

VANZANTEN:    Are you a firearm holder as a security guard?

BURVICK:    Yes.

VANZANTEN:    You are a firearm holder. What kind of firearm do you have on you?

BURVICK:    Um, I don't have no firearm on me.

VANZANTEN:    No, no, as far as being a firearm holder.

BURVICK:    I'm working on it.

VANZANTEN:    So you don't have a firearm.

BURVICK:    No. I'm in the process of ...

VANZANTEN:        So you don't have a license to carry.

BURVICK:           No.

*Id.* at 3:48–4:05 (Timestamp 18:33:03–18:33:20).

Vanzanten's question was, at best, unclear as to whether he was asking Burvick whether he had a firearm on him at the time, or whether he was asking what kind of firearm Burvick was authorized to "hold" when conducting his security guard duties.   More importantly, given that Vanzanten's early questioning of Burvick focused on whether he had a firearm on him at that time, a reasonable person in these circumstances would likely reiterate in later questioning that they do not have a firearm on them presently.

The government also argues that Burvick "was consistently holding a plastic bag against the relevant pocket, removing it only when asked to produce his license and returning it to the same position as soon as he finished" and that "the use of the bag to cover the weighted pocket raised [Vanzanten's] suspicions."  Opp'n at 15.  At the suppression hearing, Vanzanten referred to Burvick's holding of the bag by the term "blading," which appears to be a term used by police officers to describe a person whose physical movements indicate an intent to conceal something illegal.  Tr. at 79:16–18.  But under the totality of the circumstances, whatever Vanzanten may have subjectively believed, this Court finds that the way Burvick held the plastic bag did not establish reasonable suspicion of criminality.  Burvick did move the bag to the center of his body after Vanzanten made clear that he was asking Burvick to hand over his security guard license.  Suppression Hr'g Gov. Ex. 2 at 4:27 (Timestamp

18:33:28).  The rest of the time, however, Burvick was standing naturally with the bag down by his side.  Indeed, "[w]hat the Government characterizes as ominous 'blading' appears to be a natural positioning of [Burvick's] body" as he answered Vanzanten's questions.  *United States v. Dozier*, No. 23-cr-472 (OEM), 2024 WL 3849477, at *4 (E.D.N.Y. Aug. 16, 2024) (finding no reasonable suspicion to stop and frisk defendant).  Moreover, when Vanzanten asked Burvick to move the bag away from his leg area while Officer Charles reviewed Burvick's identification, Burvick immediately complied, adding, "No problem."  Suppression Hr'g Gov. Ex. 2 at 7:06–7:09 (Timestamp 18:36:07–18:36:10).

This Court shares the concerns voiced by other courts about invoking "blading" in the reasonable suspicion inquiry when police apply the term to what otherwise would be considered a natural body movement or position.  *See, e.g., Dozier*, 2024 WL 3849477, at *4; *United States v. Dixon*, 20-CR-368 (NSR), 2021 WL 1662492, at *12 (S.D.N.Y. Apr. 28, 2021) (finding that "the alleged 'blading' away from [the] [o]fficer" was not "an attempt to flee or conceal'" as "[i]t is completely normal for someone, when called to by another walking behind him, to pivot his body so that he can see the person behind him"); *United States v. Parker*, No. 99-CR-123 (JG), 1999 WL 997282, at *8 (E.D.N.Y. Oct. 18, 1999) (holding that defendant's alleged "blading" was "entirely consistent with a desire to avoid speaking to [the officer] and to walk to his home across the street").  As one court noted, "[i]n the absence of other circumstances that render the defendant suspect to some degree, mere 'blading' is insufficient to support a stop.  It is not sufficiently indicative of criminal activity, and it is readily

48

consistent with innocent explanations." *Parker*, 1999 WL 997282 at *8. The government cannot simply parrot a term of police jargon as a substitute for specific, articulable circumstances that establish reasonable suspicion for a stop or frisk. Here, Burvick's holding of the plastic bag by his side in a natural arm position was objectively "consistent with innocent explanations" and does not give rise to reasonable suspicion. *Id.*

In total, the circumstances in Burvick's encounter with these officers contrasts sharply with those in which courts have found that reasonable suspicion did exist. *See e.g., United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) (finding reasonable suspicion where the totality of circumstances included defendant observed at location known for drug dealing, in van connected with someone engaged in drug trafficking, driving in way that indicated evasion of surveillance, and use of beepers); *id.* at 517 (holding reasonable suspicion existed for the co-defendant when the circumstances included "two appearances at what probably was a stash pad, the use of a suspected drug dealer's van, the counter-surveillance operation of that van, the use of a beeper, the transportation of packages apparently involved in narcotics transactions, and stealthy movements and activities customarily associated with drug trafficking"); *Simmons*, 560 F.3d at 108–109 (noting that circumstances which included defendant's refusal to remove hands from pocket after two orders to do so from officers, report of assault in progress, and defendant matching description provided by 911 dispatcher, supported a finding of reasonable suspicion); *United States v. Padilla*, 548 F.3d 179, 187–89 (2d Cir. 2008) (holding that reasonable suspicion was

present based on defendant's presence in high-crime neighborhood, following man whose appearance suggested drug use in street otherwise deserted, use of dark path at night, and apparent adjustment of concealed firearm).

*      *      *

In sum, the officers did not have reasonable suspicion to seize Burvick at the moment their encounter transformed into a *Terry* stop. By the time the officers directed him to hand over his security license, Burvick had already responded to an urgent directive from Vanzanten to leave the gated area of his home to come talk to the officers on the street; responded calmly to their questions; initially consented to a search of his person, before being told he could refuse to consent (which he then did); and provided plausible answers and noncontradictory statements to the lead officer's many questions. At that point, any reasonable suspicion the officers may have had based on the information they initially received from the 911 caller and dispatcher had been dispelled, and they should have concluded the investigatory stop.

This is not to say that Vanzanten and his fellow officers had no choice but to dismiss the 911 caller's allegations as unfounded at that point. They certainly had the option to continue to investigate her claims after ending their street encounter with Burvick. For example, if they remained unsure whether Burvick had, in fact, threatened her or other neighbors earlier in the evening, they could have tried to re-contact the caller to conduct an in-person interview, to confirm her full name, or to identify other potential eyewitnesses. They could have conducted a neighborhood canvass to see if others could confirm (or dispel) the caller's allegation that Burvick

50

had "threatened" her or anyone else.  And they could have obtained a warrant for Burvick's arrest if that investigation yielded probable cause to charge him with harassment or any other crime.  The Court appreciates the need for law enforcement to have broad latitude to investigate possible crimes in progress, particularly if a 911 caller's accusations suggest that someone might pose a danger to the community.  But when Burvick's actions, demeanor, and responses to the officers' questions did not give rise to reasonable suspicion that the anonymous caller's accusations were accurate, nor that he was about to commit any other crime, the Fourth Amendment precluded the police from detaining him any longer.

Because the seizure of Burvick was constitutionally improper, any physical evidence, including the firearm, that the officers obtained as the fruit of the unlawful seizure must be suppressed.  *See, e.g., Freeman*, 735 F.3d at 94 (suppressing firearm discovered after a *Terry* stop for which police did not have reasonable suspicion).  Separately, as discussed *infra*, the Court independently concludes that, even assuming the officers had the requisite suspicion for a *Terry* stop at the time they asked for Burvick's security guard license and prevented him from leaving the scene, they were not justified in searching his person without his consent because they did not have reasonable suspicion that he was armed and dangerous.[5]

---

[5] Because the Court grants Burvick's motion to suppress the physical evidence obtained from his stop and frisk under existing Fourth Amendment jurisprudence, the Court does not reach Burvick's novel argument that the Fourth Amendment requires the government to meet the higher standard of probable cause, or obtain a warrant, where the stop was initiated by an official directive that the person leave the "curtilage" of their home.

### III.    Did the officers have reasonable suspicion justifying a frisk of Burvick's person?

In the alternative, even assuming, *arguendo,* that the officers had reasonable suspicion to seize Burvick at (or after) the moment their encounter transformed from brief investigative questioning into a *Terry* stop, the physical evidence seized must be suppressed on another ground: the officers did not have the independent reasonable suspicion that the Fourth Amendment requires to frisk Burvick.

As a threshold matter, the inquiry for a frisk is different than a stop: "[a] police officer must have a reasonable suspicion *not only* that criminal activity is afoot, but *also* that the person suspected is 'armed and dangerous.'" *Weaver*, 9 F.4th at 139 (emphasis supplied) (citing *Terry*, 292 U.S. at 30).  If an objectively reasonable officer in these circumstances lacks reasonable suspicion that the suspect is "armed and presently dangerous," then the frisk is unconstitutional.  *Terry*, 392 U.S. at 30.  As the Second Circuit underscored in a recent *en banc* decision, there is an important principle at work requiring courts to separately analyze these constitutional questions.  For this "further line of inquiry recognizes that a frisk is a more intrusive invasion of a person's security than a stop."  *Weaver,* 9 F.4th at 139.

On this record, it is clear that the officers lacked an objectively reasonable basis to conclude that Burvick was "presently armed and dangerous" at the moment when, over four minutes into their encounter, Vanzanten finally decided to pat down Burvick's legs and search inside Burvick's pockets without his consent.  Each of the government's proffered justifications for the frisk are addressed in turn below.

### A. Factors present in the initial, investigatory stop

As an initial matter, the reasons discussed *supra* as to why the officers did not have reasonable suspicion to seize Burvick on suspicion of criminal activity similarly apply to the later frisk. The 911 call by a person who identified herself only as "D-E-E" did not have sufficient indicia of reliability; the officers' brief neighborhood canvass, Burvick's actions, and his responsiveness to Vanzanten's questions dispelled any initial suspicion that may have existed based on the 911 call alone; any possible nervousness observed by the officers did not establish objectively reasonable suspicion to justify a frisk; Burvick was not evasive; his statements were not contradictory; and the way Burvick held the black plastic bag he had with him did not establish reasonable suspicion.

Nor did Burvick's earlier refusal to consent to a search of his person provide reasonable grounds for Vanzanten to override his assertion and frisk him anyway. As noted *supra,* it is well established that a refusal to cooperate alone does not constitute reasonable suspicion for law enforcement to conduct a *Terry* stop. And some courts have read the Supreme Court's holdings in this area to apply equally to the decisions to extend an otherwise valid stop into a nonconsensual detention or to search the suspect. *See, e.g. United States v. Santos*, 403 F.3d 1120, 1126 (10th Cir. 2005) ("A refusal to consent to a search cannot itself form the basis for reasonable suspicion: it should go without saying that consideration of such a refusal would violate the Fourth Amendment." (internal quotation marks omitted)); *United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998) ("agree[ing]" with defendant's

"assert[ion] that his refusal to consent to search should not be used to contribute to the officer's suspicions"); *United States v. Massenburg*, 654 F.3d 480, 490–91 (4th Cir. 2011) (holding that nonconsensual frisk of defendant was not supported by reasonable suspicion and stating that defendant's "refusal to cooperate [with a police request to conduct a voluntary search], without more, does not furnish the minimal level of objective justification needed for a detention or seizure") (quoting *Bostick*, 501 U.S. at 437).  And even assuming there might be *some* circumstances in which a suspect's refusal to agree to a search after being asked for consent appears to be so objectively suspicious as to provide grounds to believe that the person is armed and dangerous — either alone or in combination with other factors — such circumstances are not present here.

Finally, the dialogue between Burvick and Vanzanten about his security guard license also did not provide reasonable suspicion that he was armed and dangerous. At the suppression hearing, Vanzanten testified that his exchange with Burvick following his question about whether Burvick had his security guard license made him suspicious because Burvick "wasn't answering [his] questions direct" and ultimately was "trying to evade" the officers' inquiry.  Tr. at 26:21–27:5.  Burvick's exchange with Vanzanten, however, did not consist of contradictory or evasive statements, and certainly did not provide reasonable suspicion that Burvick was armed and dangerous.

It is true that Burvick did not immediately reach into his pocket and give the officers his security guard license when Vanzanten asked if he had it "on" him. But when Vanzanten clarified his request, Burvick quickly complied:

VANZANTEN:    You have your security guard license on you?

BURVICK:    Um, I can get it for you.

VANZANTEN:    No, no, I'm saying do you have it on you?

BURVICK:    I can get it for you.

VANZANTEN:    No, no. On you. On your person.

BURVICK:    Yes I do.

Suppression Hr'g Gov. Ex. 1 at 4:05–4:13 (Timestamp 18:33:20–18:33:28). At the suppression hearing, Vanzanten testified that Burvick's responses made him think "that [Burvick] was looking to go inside of his house. And if he did have any evidence on him, obviously that evidence would be gone if he came back with his license." Tr. at 25:23–26:5. Burvick's responses, however, could as easily be interpreted as necessary clarification before taking action in these circumstances, *i.e.,* Burvick clarifying that he could retrieve the license from his person before making any sudden movements to reach into his pockets in the presence of three uniformed and armed police officers. Additionally, the Court finds that Burvick's slight hand gesture during the second time he said "I can get it for you" cannot be construed on its own as an indication that Burvick sought to go back into his home. Suppression Hr'g Gov. Ex. 2 at 4:24 (Timestamp 18:33:25). Even if construed as some sort of pointing,

55

Burvick was not pointing to his home, which was many feet behind him and the officers.  Instead, Burvick's verbal responses to Vanzanten were plausible and responsive, and this Court finds they would not have provided reasonable suspicion to justify the officer's frisk.  Previously, Burvick calmly explained that he was minding his own business and returning home after getting something to eat.  Despite his initial consent to a search, the officer's questioning continued.  Whether Burvick needed clarification or was hesitating to provide his security guard license to Vanzanten, in the totality of circumstances, the exchange did not increase suspicion. None of Burvick's statements were contradictory.  *Cf. Rodriguez*, 469 U.S. at 4–6 ("contradictory statements" established suspicion where defendant provided name to officer when asked but third person with defendant provided same name).  And Burvick did not offer an implausible story.  *Cf. Santillan*, 902 F.3d at 57 (inability of defendants to explain where they had come from when one was driving and other was "purportedly related to the woman from whose house they had allegedly come" established reasonable suspicion to extend traffic stop).

### B. Factors arising after the seizure but before the frisk

Other factors identified by the government that took place after the seizure (*i.e.,* after the moment when Vanzanten directed Burvick to hand over his security guard's license for inspection) but before the frisk of Burvick — including Vanzanten's observations of Burvick's right cargo pocket — also did not provide objectively reasonable suspicion that Burvick was "armed and presently dangerous." *Terry*, 392 U.S. at 30.  Under the totality of the circumstances, no objectively reasonable officer

would have harbored a "fear of violence" by Burvick in that moment, nor any reason to suspect that Burvick might use a weapon "to harm the officer or others nearby." *Weaver*, 9 F.4th at 140 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)).

Vanzanten testified that he was "*considering whether there might have been* a firearm in [Burvick's cargo] pocket," when he shifted his location to be closer to Burvick's pocket, as evident in the bodycam footage. Tr. at 29:24–25; 30:1–2 (emphasis supplied). Vanzanten did so because he "wanted to get a better look at what was weighing his pocket down so heavy." Tr. at 27:19–21.

When Vanzanten asked Burvick for his security license, he stood in front of, and partially diagonal to, Burvick. Suppression Hr'g Gov. Ex. 2 at 4:20 (Timestamp 18:33:21). Vanzanten shifted his location to be more perpendicular to Burvick about 20 seconds later. *Id.* at 4:41 (Timestamp 18:33:42). Vanzanten himself testified that "[w]hen Mr. Burvick went to recover his security license, he had to remove the black plastic bag . . . that's on the side of his right leg. When he did so, I was able to see the cargo pocket pant weighing down heavier, as if there was an object inside there, *possibly* a firearm." Tr. at 27:14–18 (emphasis supplied).

But these observations did not provide reasonable suspicion that Burvick was armed and dangerous. The government has cited *no* case — and this Court knows of none — in which police observations of a "heavy" or "weighted" area of a person's clothing that did not contain any observable firearm-like features has been sufficient to justify a frisk. By contrast, where the Second Circuit has upheld a "bulge" as grounds for a frisk for possible weapons, there has been more than just "weight"

involved. *United States v. Hagood*, 78 F.4th 570, 577 (2d Cir. 2023) (finding bulge established reasonable suspicion where officer testified that fanny pack "'appeared heavy, like there was a weighted object inside of it' and contained 'an elongated, rigid, solid object' that 'appeared . . . to be potentially the top slide of a handgun'"); *United States v. Hawkins*, 37 F.4th 854, 859 (2d Cir. 2022) (finding officer's observation of "'bulge' around [defendant's] waistline when [he] removed his hands from his sweatshirt pockets" established reasonable suspicion supporting frisk, where officer also learned eyewitness heard gunshot and observed defendants coming down from rooftop, along with other facts supporting initial stop). By contrast, in *United States v. Dixon*, the district court granted a motion to suppress where the officer who frisked the defendant merely observed the weight of the bag and "did not see the outline of any weapon prior to reaching for the bag" and where information communicated to the officers conducting the stop only referenced the bag's weight. 2021 WL 1662492 at *6, *13, *15.

The distinction in the caselaw between observations of a bulge with the shape or outline of a firearm-looking object and police observations of "weight" alone is an important one. A citizen may well be carrying any number of "heavy" but perfectly legal items in a pocket or elsewhere on their person that they reasonably prefer to keep private during a police encounter. These might include, among other things, a handwritten journal; medicine to treat or prevent pregnancy, a sexually transmitted infection, or any other condition; or a paperback book whose title or contents are critical of the government. And even if police suspect that a person's "weighted"

pocket might conceal some evidence of illegal activity, that is still insufficient to justify a warrantless frisk. *See, e.g., United States v. Hussain,* 835 F.3d 307, 313 (2d Cir. 2016) (reiterating the requirement that officers have reasonable grounds to believe a suspect is presently armed and dangerous before performing a frisk "is based on the premise set forth in *Terry* that [a] search must be genuinely protective" and not have a "purely evidentiary" purpose).

Here, Vanzanten's speculation that Burvick's right cargo pocket "possibly" contained an illegal firearm was based on its weight alone, and not on a shape or outline of an object resembling a firearm. All of Vanzanten's statements — in the bodycam footage and in the suppression hearing — described the weight of the firearm and not any apparent shape or outline visible from Burvick's cargo pocket. And no firearm-like outline or shape is evident in Burvick's right cargo pocket in the video. There was also no report of a firearm even being seen, let alone a gun being fired, in the 911 call that led to the stop. As such, the weight of Burvick's right cargo pocket, viewed in the totality of circumstances, did not provide reasonable suspicion that he was "armed and dangerous."

### C. Additional factors

The officers' own conduct towards Burvick also shows that they subjectively did not fear, and a hypothetical reasonable officer objectively would not fear, that Burvick was armed and dangerous. Throughout the encounter, the officers did not direct Burvick to move away from the sidewalk to a more isolated area. Instead, the officers remained where they initially stopped Burvick: on the sidewalk on a city

street traversed by numerous others.  The bodycam footage shows that at least two people walked directly by Burvick and the officers during the stop.  Roughly 40 seconds after the officers met Burvick on the sidewalk, a person walked down the road parallel to the sidewalk, passing Burvick and the officers.  Suppression Hr'g Gov. Ex. 2 at 3:52 (Timestamp 18:32:53).  Some 15 seconds later, a person with a dog walked down the sidewalk itself, cutting in between Vanzanten and Officer Daguanno and passing very close to Burvick.  *Id.* at 4:07–4:12 (Timestamp 18:33:08–18:33:13).  The sidewalk where the officers kept Burvick was immediately adjacent to the front areas of a row of homes.  The officers' decision to maintain their position with Burvick on a street adjacent to homes and where numerous people were passing by on a busy early-summer evening in Brooklyn reflects what a reasonable officer during the encounter would have deduced:  there was not reasonable suspicion that Burvick was armed and dangerous.

In addition, Vanzanten looked away from Burvick many times throughout the encounter, as opposed to keeping his eyes on him in the way that a reasonable officer would do if they believed he might be armed and dangerous.  On the bodycam footage, Vanzanten appears to look away from Burvick at least 11 times between the time the officers met Burvick on the sidewalk and when Vanzanten frisked him.  For example, while the other officers were checking Burvick's identification and just prior to the frisk, Vanzanten turned his gaze away from Burvick for a nearly 10 second stretch — interrupted by just one brief glance back at Burvick — and while looking away from Burvick, stared at the ground and rested his left hand on the side of his face closest

to Burvick. *Id.* at 6:48–6:58 (Timestamp 18:35:49–18:35:59). During that stretch of time, Vanzanten also turned away from Burvick to watch a car drive down the road. *Id.* at 6:56 (Timestamp 18:35:57). Vanzanten — a lieutenant who had 20 years of experience in law enforcement, including dozens of encounters with people with firearms (Tr. at 12:9–11, 14:10–12) — clearly did not have a subjective belief that Burvick was presently armed and dangerous.

To be sure, as discussed *supra*, the standard for evaluating suspicion for a seizure or a frisk is an objective one — independent of what the officer subjectively believed. Nonetheless, the Court finds that Vanzanten's actions are fully in line with how a reasonable officer would act in circumstances where he did not harbor any reasonable suspicion that the person he was questioning posed a present danger to himself, his fellow officers, or the public.

On this record, the government's reliance on *United States v. Weaver,* 9 F.4th 129 (2d Cir. 2021) — in which the Second Circuit, sitting *en banc,* held that the frisk of a defendant *was* supported by reasonable suspicion that he was armed and dangerous — is misplaced. Indeed, *Weaver* only underscores why the officers lacked reasonable suspicion to frisk Burvick. The factors identified by the Court in *Weaver* are significantly greater in number and probative value than those at issue here. In *Weaver*, the *en banc* majority cited as "the most powerful evidence" that by the time the officer had frisked the defendant, "he had *thrice* witnessed [defendant] make suspicious movements concentrated around his waist and pelvis, where a firearm might easily be concealed." *Id.* at 147. Those movements included "a noticeable

'upward tug' to [defendant's] waistband," the defendant's "'slouch[ing] down' and 'shift[ing] his hips' in his seat when [the officer] approached the car, using two hands to 'push[ ] down his pelvic area' as though he was trying to conceal something," and, upon exiting the car pursuant to the officer's instruction, standing "unusually close to the vehicle, pressing his pelvis only 'a few inches' from the quarter panel." *Id.* Those three movements were "viewed in relatively quick succession" by the officer and "formed the primary basis for his suspicion that [defendant] was hiding something dangerous on his person, in particular around his waistline." *Id.* Further, the defendant's "slouching in his seat" suggested that "he was trying to minimize his visibility as the officer approached," his "squirming and pushing down on his pelvis" suggested that "he was trying to hide something in his pants," and his using both hands to do so suggested that "he was putting a fair bit of effort into this attempt at concealment." *Id.* at 148. The Court also relied heavily on the facts that the defendant "reflexively denied having anything"; when the vehicle approached the side of the road, the "backseat passenger 'quickly' opened his door, 'into traffic[,]'" making the officers think he "was trying to flee"; the officer recognized the defendant, seated in the front seat, as the "man who had given a drawn-out look at the officers' car" when they passed moments earlier; and the stop occurred "in a high-crime neighborhood." *Id.* at 149–150.

None of those factors are present here. Burvick made no suspicious movements, holding his hands and bag in a natural position throughout. And Burvick did not "tug," "push," "slouch," "squirm," or "shift" anything on his body in a

way that would suggest he was trying to hide something dangerous. *Id.* at 147–148. Nor did Burvick "reflexively den[y] having anything" at the outset of his encounter with police. *Id.* at 148. Though the government argued that Burvick's statement to Vanzanten that "I don't have no firearm on me" was a "reflexive and immediate contradiction that further supported . . . suspicion" akin to that cited by the *Weaver* Court, it is readily distinguishable. In *Weaver*, one of the first things the defendant said — unprompted — to the officer who stopped him and asked him to show his hands was, "I don't got nothin'." *Id.* at 135. By contrast, Burvick calmly turned and walked over to the officers when Vanzanten directed him to "come here." Vanzanten was the first to speak. He then asked Burvick if he was having "any problems with anybody" a couple of minutes earlier. Suppression Hr'g Gov. Ex. 1 at 2:57–3:00 (Timestamp 18:32:11–18:32:15). Burvick responded — with some surprise, but no evident alarm — that he wasn't, and that he was "minding my own business," listening to music, getting something to eat, and then returning home. *Id.* at 3:00–3:10 (Timestamp 18:32:15–18:32:25). After telling Burvick someone called 911 on him, that he matched the description, and that they were inquiring as to what happened, Vanzanten himself asked, "You don't have anything on you you're not supposed to have, any weapons or anything like that?" *Id.* at 3:10–3:29 (Timestamp 18:32:25–18:32:43). Burvick responded that he had his "ID" and his security license, and that everything was "legit." *Id.* at 3:29–3:33 (Timestamp 18:32:43–18:32:48). And when Burvick said, "Um, I don't have no firearm on me," he did so only in response to a direct (albeit confusing) question from Vanzanten, who asked him

"What kind of firearm do you have on you?" — which itself followed two other confusingly-worded questions about Burvick's work as a security guard and whether he had anything "on" him that he wasn't "supposed to have." *Id.* at 3:48–3:56 (Timestamp 18:33:03–18:33:11).  Burvick's response was neither "immediate" nor "reflexive" in the ways that justified the search in *Weaver*.  For all these reasons, *Weaver* only underscores why the totality of circumstances does not support an objectively reasonable determination that Burvick was armed and dangerous.

In sum, even assuming, *arguendo,* that Burvick was lawfully stopped by police prior to Vanzanten's frisk of his person, the officers nonetheless lacked objective, reasonable suspicion that Burvick was "armed and presently dangerous"— the necessary justification for a frisk.  *Terry*, 392 U.S. at 30.

Because the government subjected Burvick to an unconstitutional seizure and, thereafter, an unconstitutional frisk of his person, the physical evidence, including the firearm, resulting from the frisk must be suppressed.

## <u>CONCLUSION</u>

For the foregoing reasons, Burvick's motion to suppress the physical evidence obtained from the search of his person is GRANTED.

In the interest of judicial economy, given the sole count with which Burvick is charged in the Indictment, the Court reserves decision on Burvick's motion to suppress the statements Burvick made to officers upon his arrest until the parties have a chance to confer about whether such a ruling is necessary in light of this order.

SO ORDERED.

_/s/ Nina R. Morrison_

NINA R. MORRISON
United States District Judge

Dated: January 17, 2025
        Brooklyn, New York